ACCEPTED
01-14-00013-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
7/15/2015 3:38:10 PM
CHRISTOPHER PRINE
CLERK

## NO. 01-14-00013-CV

In the Court of Appeals

For the First Supreme Judicial District of Texas

at Houston, Texas

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
7/15/2015 3:38:10 PM
CHRISTOPHER A. PRINE
Clerk

**Marcus B. Patterson, individually, as Independent Administrator of the Estate of Diane Patterson,**

**and as next friend of Daniel Patterson and Danae Patterson,**

**and Danae Patterson and Daniel Patterson (now 18 years old),**

**Appellants**

**v.**

**Brewer Leasing, Inc., Appellee**

On Appeal from the 334th Judicial District Court
of Harris County, Texas
The Honorable Judge Ken Wise presiding

## APPELLANTS' MOTION FOR REHEARING

HARRY HERZOG
State Bar No. 09548200
DAVID A. CARP
State Bar No. 03836500
HERZOG & CARP
P.O. Box 218845
Houston, Texas 77218-8845
713-781-7500 Telephone
713-781-4797 Facsimile
HHerzog@hcmlegal.com

Lead Counsel for Appellants

DOROTHEA "DOTTY" L. VIDAL
State Bar No. 20578100
GEARY, PORTER & DONOVAN
16475 Dallas Parkway, Ste. 400
Addison, Texas 75001-6837
972-931-9901 Telephone
972-931-9208 Facsimile
dvidal@gpd.com

Co-Counsel for Appellants

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INDEX OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.    Brewer Leasing is liable as the undisputed owner of the never leased Heil trailer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    With respect to the tractor the Court's opinion reverses statutory law, the burden of proof, and incorrectly construes cited case authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    This Court's opinion judicially reverses the 1956 Congressional statute and parallel Texas legislation, together with the federal and Texas regulatory schemes. . . . . 2

    B.    This Court's opinion incorrectly construes cited case authority. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    C.    There was no lease from Brewer Leasing to Texas Stretch. . 15

        1.    There was no consideration. . . . . . . . . . . . . . . . . . . 15

        2.    We looked for consideration. . . . . . . . . . . . . . . . . . . 15

        3.    The reason for no consideration. . . . . . . . . . . . . . . . 16

        4.    This Court also errs on the burden of proof and jury questions. . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        5.    The criminal wrongdoing clause in 49 USC § 30106(a)2 precludes any liability shifting away from Brewer Leasing. . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        6.    The big picture. . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

III.    A factual error. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

CERTIFICATE OF COMPLIANCE. . . . . . . . . . . . . . . . . . . . . . . . . 23

APPENDIX. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# INDEX OF AUTHORITIES

U.S. SUPREME COURT

*American Trucking Ass'ns. v. U.S.*, 344 U.S. 298, 302-306;
73 S. Ct. 307 (1953). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

U.S. COURT OF APPEALS

*Empire Fire & Marine Insur. Co. v. Guaranty National Insur. Co.*,
868 F.2d 357, 362 (10th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . 3

*Jackson v. O'Shields*, 101 F.3d 1083, 1086 (5th Cir. 1996). . . . . . . . . . . . 3

*Price v. Westmoreland*, 727 F.2d 494, 496 (5th Cir. 1984). . . . . . . . . . . . 3

*White v. Excalibur Ins. Co.*, 599 F.2d 50, 52 (5th Cir. 1979),
*cert. denied*, 444 U.S. 965 (1979). . . . . . . . . . . . . . . . . . . . . . . . . 2

TEXAS SUPREME COURT

*Berry v. Golden Light Coffee Company*,
327 S.W.2d 436, 439 (Tex. 1959). . . . . . . . . . . . . . . . . . . . . . . . . . 8

TEXAS COURT OF APPEALS

*Hogan v. J. Higgins Trucking, Inc.*, 197 S.W.3d 879, 884-5
(Tex. App. – Dallas 2006, no pet.). . . . . . . . . . . . . . . . . . . . . . . . . 5

*Hooper v. Torres*, 790 S.W.2d 757, 759
(Tex. App. – El Paso 1990, writ den'd). . . . . . . . . . . . . . . . . . . . . . 17

*In re Brewer Leasing*, 255 S.W.3d 708
(Tex. App. – Hou 1st 2008, mandamus den'd). . . . . . . . . . . . . . . . . . 15

*Morris v. JTM Materials, Inc.*, 78 S.W.3d 28, 38
(Tex. App. – Ft. Worth 2002, no pet). . . . . . . . . . . . . . . . . . . . . . . . 3

OTHER COURTS

*Hunt v. Drielick*, 852 N.W.2d 562 (Mich. 2014). . . . . . . . . . . . . . . . . . . . . . 13

*Jones Express, Inc. v. Watson*, 871 F.Supp. 719, 728-734
(quotes at 734)(M.D. Tenn. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Luizzi v. Pro Transport*, 2013 WL 3968736 (E.D. NY, 2013). . . . . . . . . 11, 12

*Paul v. Bogle*, 484 N.W.2d 728, 731, 735 (Mich. Ct. App. 1992). . . . . . . . 7

*Rediehs Exp., Inc. v. Maple*, 491 N.E.2d 1006, 1011
(Ct. App. – Indiana 1st, 1986, trsf den'd, cert. den'd 107 S.Ct. 1571). . . . . 4

*Shimko v. Jeff Wagner Trucking*, 2014 WL 7366190
(W.D. Wisc. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Wilson v. Riley Whittle*, 701 P.2d 575 (Ariz. Ct. App. 1984). . . . . . 9, 10, 13

FEDERAL STATUTES
49 USC § 11107. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 10, 16
49 USC § 31135. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8
49 USC § 30106. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 14, 15, 17, 18

CODE OF FEDERAL REGULATIONS
49 C.F.R. § 376. . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 11, 12, 15, 16
49 C.F.R. § 1057 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 10

OTHER
TRCP 279. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
Texas Penal Code § 37.09(a)1, 37.09(d)1, 37.08. . . . . . . . . . . . . . . . . . 18

## MOTION FOR REHEARING

The Patterson family moves for rehearing on two grounds: (1) the Court's opinion erroneously fails to hold Brewer Leasing liable as the undisputed owner of the Heil trailer with no testimony of any oral lease to Texas Stretch, and (2) the Court's opinion reverses statutory law, the burden of proof, and incorrectly construes cited case authorities with respect to any oral lease of the Peterbilt tractor, thereby erroneously allowing an oral lease to evade liability.

## I.
## Brewer Leasing is liable as the undisputed owner
## of the never leased Heil trailer.

The reason this court gave for exonerating Brewer Leasing does not apply to the Heil trailer.  The legal principle underlying the Court's liability analysis on the tractor (an oral lease can shift liability away from Brewer Leasing pursuant to 49 USC § 30106) does not apply as there was no oral lease of the Heil trailer.  The opinion correctly reflects the Patterson family's theory of liability on the trailer but then skips it in the analysis.  Brewer Leasing undisputably owned the Heil trailer, there is no written lease, and there is also no testimony of any oral lease of the Heil trailer.  Therefore

1

nothing the Court wrote absolving Brewer Leasing of liability for the Peterbilt tractor applies to the Heil trailer.

## II.
**With respect to the tractor the Court's opinion reverses statutory law, the burden of proof, and incorrectly construes cited case authorities.**

A.    **This Court's opinion judicially reverses the 1956 Congressional statute and parallel Texas legislation, together with the federal and Texas regulatory schemes.**

Between 1935 and 1956 trucking abuses were alarmingly frequent, threatening both the industry and public safety. *American Trucking Ass'ns. v. U.S.*, 344 U.S. 298, 301-306; 73 S. Ct. 307 (1953); *White v. Excalibur Ins. Co.*, 599 F.2d 50, 52 (5th Cir. 1979), *cert. denied*, 444 U.S. 965 (1979). Relationships before a collision were consistently concealed after a wreck. Owners or lessees of vehicles magically produced oral leases to uninsured companies. It takes a lot to get any Congress off dead center, but the unending stream of perjurious testimony to evade trucking liability moved Congress in 1956 to end the existence of oral leases to evade liability.

From 1956 until this Court's opinion no case in America allowed any oral lease to evade liability. Courts have detailed the history and policy decisions that forced Congress to act. As the Ft. Worth Court of Appeals correctly summarized, ". . . protecting the public from accidents, preventing public

2

confusion about who was financially responsible if accidents occurred, and

providing financially responsible defendants" were three goals of the 1956

Federal Motor Carrier Safety Act Amendments. *Morris v. JTM Materials, Inc.*,

78 S.W.3d 28, 38 (Tex. App. – Ft. Worth 2002, no pet); accord *Empire Fire*

*& Marine Insur. Co. v. Guaranty National Insur. Co.*, 868 F.2d 357, 362 (10th

Cir. 1989); *Price v. Westmoreland*, 727 F.2d 494, 496 (5th Cir. 1984). As the

Fifth Circuit noted:

> "Under the authority of 49 U.S.C. § 11107, the
> Interstate Commerce Commission regulates leases of
> equipment used in interstate commerce. *See* 49
> C.F.R. § 1057.1 *et seq.* One of the primary purposes
> of the ICC's leasing regulations is to ensure that
> carrier-lessees take control of and responsibility for
> leased equipment during the term of a lease."

*Jackson v. O'Shields*, 101 F.3d 1083, 1086 (5th Cir. 1996). *Jackson* was

another classic case of the round robin of finger pointing by carriers, lessors,

owners, drivers and insurers. *Jackson*, 1081. The *Jackson* decision correctly

notes that the failure to comply with trucking regulations "does not and should

not insulate a carrier-lessee from liability." *Jackson*, 1089.

> "The stringent regulations also eliminate the difficulty
> faced by an injured plaintiff in determining who
> controlled the vehicle; the purpose upon which the
> vehicle was embarked at the time of the accident; and
> the questions of agency, employee or independent

3

contractor status, frolic and detour, and borrowed employee."

*Rediehs Exp., Inc. v. Maple*, 491 N.E.2d 1006, 1011 (Ct. App. – Indiana 1st, 1986, trsf den'd, cert. den'd 107 S.Ct. 1571). *Rediehs* contains some of the country's most cited and quoted language on the history of the 1956 amendments and the end of delegating responsibility, evading responsibility, abrogating responsibility, and eliminating fly-by-night contracting. This Court's reliance on an oral lease to evade liability returns trucking law to its pre-1956 wild west condition.

Texas Stretch spent three years denying any affiliation with Charles Hitchens and evading liability since Brewer Leasing was the lessee under a written lease. At the last minute they admitted employing Charles Hitchens (Appendix 8, 20). Now, at the last minute, Brewer Leasing denies being the lessee and in a classic example of statutorily precluded finger pointing claims Texas Stretch was the oral lessee. The 1956 Act and "stringent regulations" designed to prevent this insanity are neutered by this Court's acceptance of the claim of an oral lease.

Courts have consistently ruled that a company cannot evade liability by non-compliance with the 1956 statute or regulations. For example,

4

"The purpose of the amendments was to ensure that interstate motor carriers would be fully responsible for the maintenance and operation of the leased equipment and the supervision of the borrowed drivers, thereby protecting the public from accidents, preventing public confusion about who was financially responsible if accidents occurred, and providing financially responsible defendants. *Id.* The Interstate Commerce Commission later issued regulations that required a certificated interstate carrier who leases equipment to enter into a written lease with the equipment owner providing that the carrier-lessee shall have exclusive possession, control, and use of the equipment, and shall assume complete responsibility for the operation of the equipment for the duration of the lease. *See* 49 C.F.R. §§ 376.11-12 (2005). These regulations are known as the Federal Motor Carrier Safety Regulations."

\*\*\*

"One of the purposes of amending the Interstate Common Carrier Act to include specific lease requirements was to prevent the type of confusion we have here as to financial responsibility. Simply because Higgins and MTR failed to enter into a lease agreement, thereby creating this confusion, Higgins should not be allowed to hide behind the protection of the federal regulations and insulate themselves from liability if they had practical control over Jackson at the time of the collision."

*Hogan v. J. Higgins Trucking, Inc.*, 197 S.W.3d 879, 884-5 (Tex. App. – Dallas 2006, no pet.).

Finding a trucking company "was in violation of both the letter and the spirit" of the written lease requirements with respect to policy limits, the deductible, and insurance disclosure, one court concluded the trucking

5

company "is estopped from enforcing the Lease indemnification provision..." *Jones Express, Inc. v. Watson*, 871 F.Supp. 719, 728-734 (quotes at 734)(M.D. Tenn. 2012). The court reversed its first holding in favor of the violative trucking company, fixing their error by concluding the unlawful and hidden insurance obligation violated the letter and the spirit of the Truth-in-Leasing regulations (49 CFR § 376) and "to allow Jones Express to pass liability for this loss on to Watson defeats the very purpose of the federal regulations." *Jones Express*, 734. The same analysis applies in our case. To allow Brewer Leasing to pass liability for this loss off to Texas Stretch through the even more violative act of an oral lease defeats every purpose of the federal and Texas laws and regulations.

The laws and regulations do several things to eliminate the 1935-1956 shenanigans.

1. Any lease must be written.
2. Any lease must contain about a dozen things.
3. The lessee must be adequately insured.
4. The vehicle must be properly marked.
5. The lease must be terminated in writing.
6. Possession must be terminated with a written receipt.
7. Possession must be terminated with removal of the markings.

Not a single one of these seven was done under the phantom oral lease from Brewer Leasing to Texas Stretch. Instead the mythological oral lease

6

contradicts the written lease, Texas Stretch had no insurance for either vehicle, the oral lease contradicts the tractor markings in all four places, and there is no written termination of the lease or receipt for surrendering possession. Others have tried similar tricks, but because the policy and purpose of the 1956 Act was to stop all the oral foolishness after the collision the tricks don't work. *Paul v. Bogle*, 484 N.W.2d 728, 731, 735 (Mich. Ct. App. 1992)(finding written lease never terminated as a matter of law due to lack of receipt for termination and lack of removal of placards, disregarding contradictory oral claims).

By giving effect to a claimed oral lease and using that oral lease to eviscerate Brewer Leasing's statutory liability this Court's opinion defeats every purpose of the law from 1956 to today. The effect of this Court's opinion is a judicial repeal of the entire purpose and policy of the 1956 Act, parallel Texas legislation, and the federal and state regulations.

This Court's opinion also judicially repeals 49 USC § 31135. Congress provided that:

> "Two or more motor carriers, employers, or persons shall not use common ownership, common management, common control, or common familial relationship to enable any or all such motor carriers, employers, or persons to avoid compliance, or mask or otherwise conceal non-compliance, or a history of non-compliance, with regulations

7

prescribed under this subchapter or an order of the Secretary issued under this subchapter." 49 USC § 31135.

Brewer Leasing and Texas Stretch shared the same President and General Manager. Both companies operated out of the same location. Texas Stretch owned 100% of the stock in Brewer Leasing (a fact perjuriously concealed for eight years). This is a classic example of two carriers with common ownership, management, and control. This Court's decision to allow an oral lease between them to avoid liability to the Patterson family eviscerates any effect of 49 USC § 31135.

What Brewer Leasing is trying to do, and this Court's opinion erroneously allows, is to be the only company with legal authority to operate the Peterbilt tractor on June 15, 2006, then improperly orally delegate those rights to uninsured parent company Texas Stretch and thereby dodge liability. The law precludes operation in this fashion. In addition to 49 USC § 31135,

> "It further seems well settled that one holding a certificate or permit authorizing him to operate a motor carrier over the highways of the State may not delegate to another the rights conferred by such certificate or permit and then release himself from liability to those injured by the negligence of the wrongfully delegated party."

*Berry v. Golden Light Coffee Company*, 327 S.W.2d 436, 439 (Tex. 1959).

8

**B.  This Court's opinion incorrectly construes cited case authority.**

Trucking laws are designed to protect the public from accidents, prevent public confusion, set responsibility when accidents occur, and provide for financially responsible defendants. This Court's erroneous analysis of cited case authorities subverts all four goals and lets Brewer Leasing benefit from violations. This Court leaves the Patterson family as unprotected as possible, confuses everyone, evades responsibility, and eliminates financial responsibility for the only insured company. None of the cases cited at pages 27-28 of the opinion allowed a trucking company to evade liability through an oral lease. This Court confused the ability of a plaintiff to use an oral lease *to create liability* versus the statutory and regulatory inability of a defendant to use an oral lease *to evade liability*. In chronological order:

*Wilson v. Riley Whittle*, 701 P.2d 575 (Ariz. Ct. App. 1984) is a collision death case with the reverse of our facts. The trucking company, Riley Whittle, owned its own vehicles and employed its own drivers. A cranberry juice load needed to be moved. An independent trucker, Meyer, called Riley Whittle looking to see if he could haul a load for them. Riley Whittle agreed and instructed Meyer "to have a trip lease signed for the load." Meyer never obtained a trip lease but he obtained the cranberry juice. When Meyer's

9

tractor broke down Riley Whittle sent $600 for repairs. Meyer drove on, made some stops, ate, drank some beer, and within spitting distance of the Riley Whittle facility had a fatal collision with Wilson. (All facts from *Wilson*, 576-7).

The court realized that a trucking company cannot benefit from violations of the law. Riley Whittle tried to claim a written lease was an essential requirement for their liability, but the court correctly declined to allow the purpose of the law to be flipped. *Wilson*, 578. After citing the policy reasons for the law the court refused to allow Riley Whittle to immunize itself from liability based on an oral lease that violated the law. "The cases are uniform in holding that absence of a written trip lease is legally irrelevant." *Wilson*, 578-9. Thus the plaintiff could use an oral lease to create additional liability. The court correctly reflected:

> "The public policy expressed by 49 U.S.C. § 11107and 49 C.F.R. § 1057 would be wrongfully frustrated if we were to allow Riley Whittle to evade the liability imposed upon it by the federal statute and regulations by asserting that a written trip lease was a condition precedent to any contract between the parties and to responsibility on its part. Instead, that policy demands a holding that Riley Whittle is liable as a matter of law." *Wilson*, 579.

The case holds an oral lease can create liability, but this Court's opinion uses an alleged oral lease to evade liability. Saying "I orally leased the truck" to evade liability is exactly what the 1956 Act ended.

*Luizzi v. Pro Transport*, 2013 WL 3968736 (E.D. NY, 2013) is an insurance coverage case. There was no oral lease, there was a written lease. Luizzi sued Sanchez over a collision, Sanchez sued State National, and then State National sued Green Mountain who placed the coverage. The court held the vehicle involved was a covered auto. Luizzi settled for $1,100,000 and State National tried to force Green Mountain to reimburse due to negligently failing to properly terminate the policy.

> "The question currently before the Court is whether the Policy, which was in effect on the day of the Luizzi-Sanchez accident, provided coverage to Pro Transport and/or Sanchez for the Luizzi-Sanchez accident . . . the Court finds that State National has proven by a preponderance of the evidence that the Sanchez vehicle was a "covered auto" and that the Policy provided coverage to both Pro Transport and Sanchez for the underlying accident."

In analyzing the facts and legal issues the trial court reviewed a one-year written lease, exhibit 44. The parties debated whether the written lease fully complied with all legal requirements. The court found it "was a valid contract under New Jersey law," but was missing many provisions required by 49 CFR § 376.12.

The case contains an excellent summary of the principles of federal trucking policies and then applies them. "Given that the public policies governing motor carriers are a driving force behind the analysis in the instant

11

case . . ." The opinion contains a discussion of courts' unwillingness to allow carriers to hide behind defective or ineffective leases to deny compensation to innocent members of the public injured in collisions. Policy considerations caution against a carrier benefitting from its own failure to comply with the regulatory scheme. A motor carrier that fails to enter into a proper written lease cannot hide from liability for that reason. Oral leases, or defective written leases, can't be used to evade responsibility to injured members of the public. Concluding that any contrary rule would create perverse incentives to create defective leases, the court held the lease "valid and enforceable in this case."

This Court's opinion flips the reasoning and result of *Luizzi*. This Court's opinion creates the perverse incentive to claim to create an oral lease in an effort to shift liability off to an uninsured carrier so that an injured citizen is denied a recovery. Contrary to *Luizzi*, this Court's opinion uses a defective oral lease to deny compensation.

*Luizzi* held that noncompliance with 49 FCR § 376.12 did not render the lease unenforceable, but did so for the express purpose of applying public policy and the goals of the regulatory scheme to create liability and deprive a company of the ability to evade liability by noncompliance. This Court's

12

opinion does the reverse: uses an alleged oral lease to defeat the statutory goals and policies by evading liability through noncompliance.

*Hunt v. Drielick*, 852 N.W.2d 562 (Mich. 2014) is an irrelevant wrongful death collision case involving "the interpretation and application of an insurance policy." *Hunt*, 565. Procedurally, the case involved writs of garnishment. *Hunt*, 564. Several leases and events are involved. Empire Fire and Marine Insurance Co. only insured Drielick Trucking for bobtail use (a tractor with no trailer). Corey Drielick was driving a tractor without a trailer, but Empire denied coverage and refused to defend.

The plaintiffs settled with Sargent Trucking and GLC, then entered into consent judgments with Corey Drielick and Drielick Trucking. All the court did was hold the bobtail portion of the policy was fulfilled and remand for evaluation of the existence of a leasing agreement between Drielick Trucking and GLC "as contemplated by the business-use exclusion's leasing clause." *Hunt*, 569.

Nothing in *Hunt* directly applies to our case. This Court's opinion quotes footnote 9 (which provided guidance to the trial court on remand), but footnote 9 is just a reference to the *Wilson* case. Our facts are very different. No policy exclusion or policy lease language is in issue. The quote from *Wilson*

13

is erroneously applied to our case. "The absence of a written trip lease is legally irrelevant" is true when applied to eliminate the ability of a trucker to distort public policy and evade liability, but it is not true when an oral lease is used to try to evade liability and defeat the purpose of the legislation and regulatory scheme.

The cited case this Court relied on most heavily is *Shimko v. Jeff Wagner Trucking*, 2014 WL 7366190 (W.D. Wisc. 2014), but the case does not involve any collision (and several cases cited by this Court in the key erroneous paragraph emphasize the importance of that distinction). The pro se litigants lost a motion for summary judgment in a dispute between a trucker and a trucking company. The trial court found fact questions on dual ownership and the existence of an oral lease.

Although this Court's opinion quotes extensively from *Shimko*, nothing in *Shimko* supports the conclusion that an oral lease can be used to shift liability under 49 USC § 30106, thereby allowing Brewer Leasing to benefit from violating federal and Texas laws and regulations.

There is a huge difference between creating liability and evading liability. The purpose of the 1956 law was to eliminate post-collision evasion techniques. While it is true that the absence of a written lease is legally

irrelevant in extending liability because an oral lease can create liability, it is also true that one of the key pillars of the 1956 Act was the elimination of oral leases to evade liability.

**C.    There was no lease from Brewer Leasing to Texas Stretch.**

1.    There was no consideration.

49 USC § 30106 uses the defined term "leases."  49 CFR § 376.2(e) defines a lease to include the requirement of consideration.  It is over nine years since Diane Patterson died and no one has ever testified in answer to interrogatories, deposition, or two jury trials to any consideration for a lease from Brewer Leasing to Texas Stretch.  No document has ever been marked as an exhibit in either jury trial reflecting any consideration.  The lack of consideration defeats the existence of a lease by definition.

2.    We looked for consideration.

In 2007 the Patterson family requested the relevant banking records of Brewer Leasing and Texas Stretch.  Brewer Leasing objected to the discovery.  The trial court ordered production, denied a Motion for Rehearing, this Court denied a mandamus effort to conceal the bank records, and the Supreme Court also denied the mandamus effort.  *In re Brewer Leasing*, 255 S.W.3d 708 (Tex. App. – Hou 1st 2008, mandamus den'd).

There is no proof of payment from Texas Stretch to Brewer Leasing for an oral lease of the Peterbilt tractor on June 15, 2006.

    3.    <u>The reason for no consideration</u>.

There is no consideration because there is no oral lease from Brewer Leasing to Texas Stretch. That's why Texas Stretch never insured the tractor. Mr. A. B. Brewer, the President of Brewer Leasing and Texas Stretch, is an elderly gentleman with a lifetime of trucking experience. (6 RR, 79-80). Mr. Lonnie Box, the General Manager of Brewer Leasing and Texas Stretch with 25 years of experience, had a side company that did trucking company compliance. (4RR, 138-140). They knew all the legal requirements, and they met all the legal requirements by virtue of a written lease from Texas Stretch to Brewer Leasing. (4RR, 148-151; 6RR, 80-91; Appendix 9).

To conclude there was an oral lease from Brewer Leasing to Texas Stretch this Court has to do all of the following:

1. Find consideration,
2. Decide when Brewer Leasing did not own the tractor it was the lessor,
3. Decide when Texas Stretch owned the tractor it was the lessee,
4. Decide both companies can violate 49 USC §§ 11107, 13906, 14102; 49 CFR § 376; and 37 Tx Admin Code 4.11,
5. Ignore four signs painted on the tractor contradicting the oral lease, and

16

6. Find termination of the written lease from Texas Stretch to Brewer Leasing.

4. <u>This Court also errs on the burden of proof and jury questions</u>.

To evade liability Brewer Leasing must prove the unplead affirmative defense of shifting liability by virtue of a lease, thus they must obtain a jury finding in their favor. This Court's opinion incorrectly moves that burden to the Patterson family. As the court correctly notes, "It was incumbent upon the party with the burden on the issue to request a correct issue which was raised by the evidence and obtain a favorable answer in order to prevail upon that part of the case..." *Hooper v. Torres*, 790 S.W.2d 757, 759 (Tex. App. – El Paso 1990, writ den'd).

Brewer Leasing was the party with the burden on this issue. "We are not liable because we just owned the tractor" was Brewer Leasing's argument. As the owner Brewer Leasing was liable unless they proved compliance with 49 USC § 30106. Compliance was not conclusively established so it was waived by Brewer Leasing's failure to request and obtain a jury finding of a lease to Texas Stretch.

As the party arguing (1) ownership of (2) a leased tractor with (3) no criminal wrongdoing, Brewer Leasing had the burden to obtain those jury findings. With no jury finding on any element, Brewer Leasing's independent

17

ground of defense is waived pursuant to Texas Rule of Civil Procedure 279. Brewer Leasing never even argued this defense or cited the relevant statute. The Patterson family briefed it out of completeness, and at pages 29-30 this Court confuses our briefing with Brewer Leasing's burden of proof and burden of jury submission and findings.

Brewer Leasing never argued they complied with 49 USC § 30106, probably because they knew they did not. Brewer Leasing also never requested or obtained any jury finding pursuant to 49 USC § 30106.

5. The criminal wrongdoing clause in 49 USC § 30106(a)2 precludes any liability shifting away from Brewer Leasing.

Any analysis of obstruction of justice compared to Brewer Leasing's concealment of the reports of 43,444 nanograms of cocaine metabolite they received but hid from the police, assistant district attorney, lawyers and litigants, and trial judge compels the conclusion there was criminal wrongdoing on the part of Brewer Leasing. Texas Penal Code §§ 37.09(a)1, 37.09(d)1, 37.08; Appendix 3, 4, 5, 6, 13; 11 RR, PX 503, 517, 520, 521, 522.

6. The big picture.

Texas Stretch and Brewer Leasing lied for 1,000 days about who employed Charles Hitchens. (Appendix 8, 12, 20). We pierced that lie.

18

They simultaneously concealed and lied about Charles Hitchens' cocaine level. We pierced that lie and fraud. (Appendix 3, 4, 5, 6, 13).

They lied about who owned Brewer Leasing: "Mr. Brewer owns 100% of Brewer Leasing" turned into Texas Stretch owned 100% of Brewer Leasing. (4 RR, 141; 6 RR, 69-70; Appellee's Brief). That successful lie precluded us from proving Brewer Leasing's liability as a single business enterprise with Texas Stretch.

The fourth big lie is the classic after the wreck fabrication of an oral lease. In this case, an oral lease that would:

- be impossible, as Texas Stretch owned the tractor on the date of the alleged lease to Texas Stretch

- be impossible, as Brewer Leasing did not own the tractor on the date of the alleged lease by Brewer Leasing

- be violative of federal statutes

- be violative of federal regulations

- be violative of Texas statutes

- be violative of Texas regulations

- create a lessee with no liability insurance

- contradict and reverse a written lease

- contradict and reverse four painted placards on the tractor

19

- contradict the entire theory and purpose of the 1956 Act and companion Texas law.

Brewer Leasing testimonially admitted liability for a reason. (4 RR 138-40, 151; 6 RR 70). No lawyer for Brewer Leasing ever filed any document with any court claiming an oral lease evades statutory liability for a reason. But this Court's opinion revives the legal theory that an oral lease can be used to shift liability, driving a stake through the 1956 federal law's heart and the parallel Texas legislation.

## III.
## A factual error.

The opinion contains one factual error. It is minor, but if it created an unfavorable impression it needs to be corrected. At page four the Court writes "the jury was then dismissed," but that is erroneous.

On Monday, April 6, the April 4 settlement with Texas Stretch was implemented. The venire panel then answered the jury questionnaire, oral voir dire was conducted, the jury was seated, and a jury trial progressed for more than a week. During the second week, shortly before the Patterson family called their last damage witnesses, Ray Bellew & Sons settled. Charles Hitchens had already stipulated to 100% fault and invoked his privilege against self-incrimination. At that point Charles Hitchens waived the

20

jury with the Patterson family's agreement. Evidence was concluded and closing arguments were then given to the court without a jury.

## **CONCLUSION**

This Court should withdraw its opinion of June 30, 2015, delete the erroneous paragraph at pages 27-28, and reverse and render judgment against Brewer Leasing for the negligent driving of Charles Hitchens while operating a Heil trailer owned by Brewer Leasing with no lease, or while operating a Peterbilt tractor that Brewer Leasing is estopped to deny owning with no written lease to any other company combined with Brewer Leasing's criminal wrongdoing.

Respectfully Submitted,

HERZOG & CARP, P.C.

By:   /S/Harry Herzog
      Harry Herzog
      State Bar No. 09548200
      P.O. Box 218845
      Houston, Texas  77218-8845
      (713) 781-7500 Telephone
      (713) 781-4797 Facsimile
      HHerzog@hcmlegal.com

*COUNSEL FOR APPELLANTS*

21

By:    /S/Dorothea Vidal
       Dorothea "Dotty" L. Vidal
       State Bar No. 20578100
       dvidal@gpd.com
       Geary, Porter & Donovan, P.C.
       One Bent Tree Tower
       16475 Dallas Parkway, Suite 400
       Addison, Texas 75001-6837
       P.O. Box 700248
       Dallas, Texas 75370-0248
       972-349-2211 Telephone
       972-931-9901 Facsimile

*CO-COUNSEL FOR APPELLANTS*

CERTIFICATE OF SERVICE

This is to certify that in accordance with the Texas Rules of Appellate Procedure a true and correct copy of the above and foregoing Brief of Appellants has been sent to all parties and/or counsel of record listed below via electronic filing and email on July 15, 2015.

George W. Long
Attorney at Law
2000 East42nd Street, Suite G110
Odessa, Texas 79762
george.long.mexico@gmail.com

       /S/ Harry Herzog
       Harry Herzog

## CERTIFICATE OF COMPLIANCE

This brief complies with the typeface and length requirements of Texas Rule of Appellate Procedure 9.4 because:

(1)     This brief complies with typeface and the type style requirements of Rule 9.4(e) because the brief has been prepared in a conventional typeface using WordPerfect with Arial 14-point font.

(2)     This brief complies with the length requirements of Rule 9.4(i)(2)(D) because it contains 4,445, excluding the parts of the brief exempted by Rule 9.4(i)(1).

     /S/Harry Herzog     
Harry Herzog
Attorney for Appellants

23

# **APPENDIX**

Appendices 3-6, 8, 9, 12 and 13 were in the original Appellants' Brief.
Appendix 20 contains PX 335, referred to in Appendix 8.

3  Brewer Leasing test results to HPD    (PX 263)

4  DA report declining prosecution     (CR 75)

5  Mr. Patterson's affidavit on fraud    (Supp CR 82)

6  Mr. Herzog's affidavit on fraud     (Supp CR 75)


8  Who employed Charles Hitchens    (Summary of exhibits)

9  Brewer Leasing lease to Texas Stretch  (PX 302)


12  Mr. Herzog's two affidavits on pleadings

13  Plaintiffs' Fourth Amended Petition   (CR 29)


20  Supplemental Response of Texas Stretch to
    Plaintiffs' Motion for Partial Summary Judgment (PX 335)

# Appendix 3

7136916883

## Texas Stretch Inc.

2103 Skinner road
Houston, Texas 77093
713-691-2779
Fax. 713-691-6883

| Send to: H P D | From: C.L. BREWER |
|---|---|
| Attention: Officer Harwell | Date: 7-26-06 |
| Office Location: Houston TX | Office Location: Houston TX |
| Fax Number: 713-247-5366 | Phone Number: 281-808-2649 |

☐ Urgent
☐ Reply ASAP
☐ Please comment
☐ Please Review
☒ For your Information

Total pages, Including cover: _2_

Comments:

I sent both. His hire in test
and Post accident Test

Thanks Butch

00158

Fax sent by using DP Informer v1 0    05/02/2006 4 51:04 PM   P. 4 of 8

FleetScreen, Ltd.
6000 Western Place
Suite 480
Fort Worth, Texas 76107

**ATTENTION:**

Butch Brewer

Texas Stretch, Inc.                          Participant:  Charles A Hitchens
2103 Skinner Road                            Participant ID:      337
Houston, TX 77093                                                ███ ██████865

## Results of DOT Controlled Substance Test

|  |  |  |  |
|---|---|---|---|
| Record Status: | Negative | Laboratory | LabOne, Inc. |
| Test Type | Pre-Employment | | 10101 Renner Boulevard |
| Collection Date/Time | 04/11/2006 12:10 PM | | Lenexa, KS 66219-9752 |
| Batch ID: | 20060502 | Collection Site | Texas Stretch, Inc. |
| Specimen ID: | 45213879 | | 2103 Skinner Road |
| Date COC Received: | 05/02/2006 | | Houston, TX  77093 |
| Sample Type: | Urine | Specimen Collector: | Douglass A Schoppe |

| Substance Tested | Result | Substance Tested | Result |
|---|---|---|---|
| Amphetamines | Negative | Cocaine | Negative |
| Marijuana | Negative | Opiates | Negative |
| Phencyclidine | Negative | | |

In accordance with applicable Federal requirements, my determination/verification is as above

_____                          5/2/2006
Garrett R. Tucker III, MD, MPH                            Verification Date

*Hire date*

FleetScreen, Ltd.
6000 Western Place
Suite 480
Fort Worth, Texas  76107

**ATTENTION:**

Butch Brewer

Texas Stretch, Inc.

2103 Skinner Road

Houston, TX  77093

Participant  Charles Hitchens

Participant ID.     337

SSN:  ████████888S

## Results of DOT Controlled Substance Test

| | |
|---|---|
| Record Status. Positive | Laboratory: LabOne, Inc. |
| Test Type  Post-accident Test | 10101 Renner Boulevard |
| Collection Date/Time  06/15/2006 1 28 PM | Lenexa, KS 66219-9752 |
| Batch ID. 20080621 | Collection Site  Texas Stretch, Inc. |
| Specimen ID  36839345 | 2103 Skinner Road |
| Date COC Received: 06/20/2006 | Houston, TX  77093 |
| Sample Type  Urine | Specimen Collector  DOUGLAS A SCHOPPE |

| Substance Tested | Result | Substance Tested | Result |
|---|---|---|---|
| Amphetamines | Negative | Cocaine | POSITIVE |
| Marijuana | Negative | Opiates | Negative |
| Phencyclidine | Negative | | |

In accordance with applicable Federal requirements, my determination/verification is as above.

_____

Garrett R. Tucker III, MD, MPH

8/21/2006

Verification Date

*Accident date*

**00115**

SYSTEM ADVISORY: REPORT ENTERED USING PERSONAL COMPUTER   VER-5.00-W
************************************************************************
*    ENTRY DEVICE: MOTOROLA MW-520 736SDL0504 345                    *
*    ENTRY FROM DATE-062906 TIME-1345  TO   DATE-062906 TIME-1444    *
*    TRANSFER DEVICE: COMPAQ TOWER 220614 S77 WIN2000     VER. 5.00-W*
*    TRANSFER DATE-062906 TIME-1656   LOAD DATE-070206 TIME-1019     *
*    LOCATION OF OFFENSE: POLICE DISTRICT-DISTRICT 20       DIST-20  *
************************************************************************
       EVIDENCE WAS TAGGED-N       LATENT PRINTS WERE LIFTED AT A SCENE-N

Supplement entered by = 89942

------------------------------------------------------------------------

No-0002

Offense- DEATH DUE TO TRAFFIC ACCIDENT
                         Street location information
Number-     14800 Name-KATY                    Type-FWY      Suffix-
Apt no-        Name-HWY 6                       Type-        Suffix-N
Date of offense-06/15/06              Date of supplement-07/27/06
Compl(s) Last-PATTERSON       First-DIANE       Middle-YARBROUGH
                     Recovered stolen vehicles information
 Recovery location-                          District-   Beat-    00
 Stored-                          by-
Officer1-D.L. HARWELL           Emp#-085506 Shift-1 Div/Station-MOBILITY

                      SUPPLEMENT NARRATIVE

OFFICER HARWELL DOING A FOLLOW-UP ON FATALITY ON 14800 KATY FWY ON 7/26/06.
OFFICER HARWELL CALLED TEXAS STRETCH TRUCKING COMPANY ON 7/26/06 AND TALKED TO
C.L. BREWER.HE FAXED ME THE TOXICOLOGY REPORT OF CHARLES HITCHENS FOR HIS
PRE-EMPLOYMENT AND POST ACCIDENT URINE TEST. THE PRE-TEST SHOWED NEGATIVE ON ALL
SUBSTANCES WHICH INCLUDE; AMPHETAMINES, MARIJUANA, PHENCYCLIDINA, COCAINE, AND
OPIATES. THE POST-ACCIDENT TEST SHOWED POSITIVE ON COCAINE. OFFICER TALKED TO
CHIEF INTAKE DA J. ORTIZ IF WE SHOULD SUBPOENA THE LAB RECORDS TO GET THE
QUANTITY OF COCAINE IN HIS SYSTEM. HE TOLD ME TO CONTACT THE LAB AND SEE IF
THERE WERE QUANTITATIVE RESULTS. I CONTACTED LABONE INC AT 1-913-888-8397 AND
THEY SAID THERE ARE QUANTITY RESULTS IF THE ACCOUNT IS SET UP FOR IT. I WAS TOLD
TO TALK TO DON HAHN AT 1-800-728-4064 X1632 TO PURCHASE A LITIGATION KIT FOR
$200.00. I WILL TALK TO THE DA TOMORROW AND SEE IF THEY WANT TO PURSUE THIS
LITIGATION KIT. TALKED TO METRO PD, OFF GOODNIGHT ABOUT THE SCALE DRAWING. HE
STATED OFF PORTER HAS JUST COME BACK TO DUTY AND HAS NOT FINISHED THE SCALE

# Appendix 4

lark Bearden - CaseDeclineID[1].pdf

# Case Decline Report

## FURTHER INVESTIGATION NEEDED

**Defendant First:** Charles                    **Defendant Last:** Hitchens

**Date of Offense:** 6/15/2007  ~~Zoolo~~                 **Date of Reject:** 6/21/2007

**Offense:** Intoxication Manslaughter

**Officer First:** DL                        **Officer Last:** Harwell

**Agency:** HOUSTON POLICE DEPARTMENT

**Witness First:** Diane                      **Witness Last:** Patterson

**ADA First:** Warren                        **ADA Last:** Diepraam

**OR #:** 92975406

**Reason:**

VATS REVIEWED CASE

The defendant was driving a tractor trailer eastbound in the 14800 block of the Katy Freeway just west of Highway 6. Several Precinct Four deputies had stopped freeway traffic because they were escorting an oversize load. The defendant was not able to see the stopped traffic ahead of him for some unknown reason. He drove into several cars that had stopped. The complainant's vehicle caught fire and she was killed.

The sole act of negligence so far in the case is failing to maintain a proper lookout. However, the defendant has not given a complete statement about why he was looking down, how long he was looking down, etc.

In a case of this nature, speed is critical. The HPD has been unable to determine a speed of the defendant's tractor trailer prior to impact. It is unknown if this vehicle had satellite tracking capability that wuold be of assistance. Of the fifteen witnesses that HPD spoke to (including the C4 deputies), only a couple of them mention speed. Their opinions on speed should be more extensively investigated.

The defendant, due to federal regulatory requirements, submitted to a urinalysis which tested positive for cocaine. It is unknown whether or not the private lab tested for actual cocaine, cocaine metabolites, or quantified the amount. As of today, this information has not been obtained. Therefore, it is unknown whether the amount of cocaine is a large dose three days ago, s small dose two days ago, etc. Additionally, officers at the scene noted no signs of impairment on the defendant. This means that either they missed the signs of cocaine use or that the cocaine quantity was insufficient to cause impairment. That question, however, can't be answered until the actual amounts are obtained by HPD.

Lastly, although this office is a prosecutorial office and not an investigative office, the report and photos were submitted to a private reconstructionis t for review. From the information provided to him, he was unable to answer the above questions.



EXHIBIT
E
75

# Appendix
# 5

## CAUSE NO. 2011-64488

| | | |
|---|---|---|
| MARCUS BRENT PATTERSON, | § | IN THE DISTRICT COURT |
| INDIVIDUALLY, AS INDEPENDENT | § | |
| ADMINISTRATOR OF THE ESTATE OF | § | |
| DIANE PATTERSON, AS NEXT | § | |
| FRIEND OF DANIEL PATTERSON, | § | |
| DANAE PATTERSON, and DANIEL | § | |
| PATTERSON (now 18 years of age), | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | 334th JUDICIAL DISTRICT |
| | § | |
| BREWER LEASING, INC. | § | |
| | § | |
| Defendant. | § | HARRIS COUNTY, TEXAS |

## AFFIDAVIT

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

BEFORE ME, the undersigned authority, on this day personally appeared Marcus Brent Patterson. After being duly sworn Mr. Patterson stated under oath as follows:

### 1. Background.

"My name is Marcus Patterson. I am over the age of 18 and have never been convicted of a crime. Every statement contained in this affidavit is true and correct.

I was married to Diane Patterson for 21 years before her death. We adopted two children at birth, Daniel Patterson and Danae Patterson.

On June 15, 2006 my wife was killed in a multi-vehicle collision on Interstate 10, just west of Highway 6. I first learned of the collision when I was called by the medical examiner to assist them in gaining dental records to verify the identity of my wife.

After the wreck I heard a rumor, not verified at the time, that the driver of one of the vehicles involved in the collision was using cocaine or tested positive for cocaine.

Page 1 of 4

**EXHIBIT** 10

82

In January or February of 2007 the Houston Police Department finally released their report with regard to the collision. The Houston Police Department report reflects that Mr. Charles Hitchens, driving a Brewer Leasing vehicle, used an illegal substance, and the use of that illegal substance was a factor in the collision. Before I received the Houston Police Department report of the collision I had no other written documentation with regard to who had used an illegal substance in the collision.

2. **My personal knowledge.**

I have personal knowledge of the following:

From the time I first read the Houston Police Department report through the time of trial, which began April 6, 2009 and ended the following week, I never learned the quantity or amount of cocaine that was used, and I never learned of any scientific evidence in respect to the cocaine level in Mr. Hitchens at the time of the collision. We attempted to ascertain this information, and we discussed this in one or more phone calls with law enforcement personnel, but we were never able to learn the amount of cocaine that was in Mr. Hitchens' system at the time of the collision. In discussions that Mr. Herzog and I had with law enforcement personnel Mr. Herzog told the law enforcement personnel that he also still did not know the amount of cocaine in Mr. Hitchens' system at the time of the collision.

At some point in 2008 (I do not recall the date) we finally got the sworn testimony of Mr. Hitchens, but Mr. Hitchens decided to decline to answer questions and invoked his right against self-incrimination. Therefore, we were unable to learn from Mr. Hitchens when he had ingested cocaine, how much he ingested, and what his level of cocaine was at the time of the collision.

At some point before the trial Mr. Herzog showed me a Motion that Brewer Leasing had filed with the Court (I believe in conjunction with other defendants, including Mr. Hitchens) to exclude the evidence from the Houston Police Department investigation that Mr. Hitchens had cocaine in his system at the time of the collision. We had no evidence that indicated the amount of cocaine in Mr. Hitchens' system. Brewer Leasing was contending in writing in the document filed with the Court that there was no evidence or quantification as to how much cocaine was in his system, and that without that evidence we could not show that the cocaine had any relevance to his driving behavior. We were unable to dispute the Motion.

Starting Friday afternoon April 3 and continuing most of the day Saturday, April 4, 2009, a variety of settlement discussions were initiated by individuals other than me. During this time I had no information that indicated the quantity or specific level of cocaine in Mr. Hitchens' system at the time of the collision.

Page 2 of 4

In April 2009, before trial, during settlement discussions, and during the trial I never knew when Mr. Hichens ingested cocaine, how much cocaine he ingested, or what the level of cocaine was in his system at the time of the collision.

In privileged discussions relating to filing this suit I learned for the first time that Mr. Hitchens had a level of 43,444 nanograms. I also learned for the first time that Brewer Leasing and its lawyers knew this information as early as February of 2007, discussed the information between themselves and the insurance carrier in February and March of 2007, concealed it for two years, and lied to the Court in writing when they filed the Motion just before trial to exclude the evidence of cocaine. I was furious at the abuse of the judicial system. I still am shocked and angry at their conduct.

If I had known that Brewer Leasing was concealing the truth for two years and had lied to the judge, to me, my children, my lawyer, and other parties and lawyers in the written document that they filed with the Court, I would not have entered into an agreement with them to not execute on their assets or take an assignment in the future of their rights.

Brewer Leasing's failure to tell me the truth, and their specific false written statements with regard to Mr. Hitchens cocaine level, were essential ingredients in obtaining my consent to not execute against the assets of Brewer Leasing and were essential ingredients to my agreement to later step into the shoes of Brewer Leasing in its dispute with its insurance carrier, Home State County Mutual Insurance Company. I would never have agreed, signed, or allowed my lawyer to negotiate the Covenant to Not Execute and Agreement to Assign Claims in the future that were negotiated and agreed to that weekend if I had known then what I know now with respect to the truth concerning Mr. Hitchens' cocaine level and the truth with respect to Brewer Leasing's concealment of that cocaine level for over two years.

Now I am in a position of having to continue the lawsuit process, regardless of its turmoil and cost, to get at the truth of what happened. Brewer Leasing cheated me, my children, our lawyer, the other injured people, their lawyers, Williams Brothers and Bellew & Sons, and their lawyers."

Further Affiant sayeth not.

**Marcus Brent Patterson**

Page 3 of 4

84

85

SUBSCRIBED AND SWORN TO BEFORE ME to which witness my official hand and seal

of office on the _____27th_____ day of _____February_____, 2012.

_____

NOTARY PUBLIC

IN AND FOR STATE OF TEXAS

DONNA JEANNE DICKSON
MY COMMISSION EXPIRES
October 17, 2015

85

# Appendix
# 6

CAUSE NO. 2011-64488

| | | |
|---|---|---|
| MARCUS BRENT PATTERSON, INDIVIDUALLY, AS INDEPENDENT ADMINISTRATOR OF THE ESTATE OF DIANE PATTERSON, AS NEXT FRIEND OF DANIEL PATTERSON, DANAE PATTERSON, and DANIEL PATTERSON (now 18 years of age), | § § § § § § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § | |
| v. | § § | 334th JUDICIAL DISTRICT |
| BREWER LEASING, INC. | § § § | |
| Defendant. | § | HARRIS COUNTY, TEXAS |

AFFIDAVIT

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

BEFORE ME, the undersigned authority, on this day personally appeared Harry Herzog.

After being duly sworn Mr. Herzog stated under oath as follows:

"My name is Harry Herzog. I am over the age of 18, of sound mind, and have never been arrested, charged, or convicted of any crime. I have personal knowledge of every statement contained in this affidavit. Every statement in this affidavit is true and correct.

I. **Background.**

I was hired by Marcus Patterson to represent his family with regard to the death of his wife, Diane Patterson. Despite many efforts on our part we were unable to ascertain precisely who was responsible for the collision, or begin a comprehensive and detailed investigation of who was responsible for the collision, until the Houston Police Department accident report was released. In January or February of 2007 the police report was finally released relating to the collision that killed Diane six or seven months earlier.

Page 1 of 7

**EXHIBIT 9**

75

The HPD accident report indicates Mr. Hitchens was responsible for the collision and an illegal substance contributed to the collision. (See Exhibit 3, second page, factors 22 and 68). In the course of the next two years I engaged in a variety of conduct in an effort to ascertain exactly what illegal substance Mr. Hitchens consumed, what the level of the substance was, and to obtain proof that the substance impaired his driving behavior.

I was able to learn that Mr. Hitchens tested positive for cocaine. (Exhibit 4). However, we were never able to learn before the April 6, 2009 trial what the level or quantification of cocaine was. Mr. Elwood, a skillful and capable attorney working with Mr. Ramey on behalf of defendant Ray Bellew & Sons, attempted to obtain lab testing results by a Deposition on Written Questions. He failed. Since then I have spoken with the responsible individual at the deposition company who advised me that the lab refused to comply with the Deposition on Written Questions and refused to provide any information. Mr. Elwood has confirmed for me on several occasions that he was unable to obtain any satisfactory response to his Deposition on Written Questions.

While I was working with Mr. Elwood in an attempt to ascertain the level of cocaine I was also working with a variety of skillful and experienced plaintiffs counsel representing various injured individuals. None of us were able to obtain the information that quantified the level of cocaine.

In addition to working with other plaintiffs counsel and with Mr. Elwood on behalf of a defendant, I also attempted to ascertain the cocaine level by communicating with the Harris County Assistant District Attorney, Warren Diepraam, who was the point person with respect to the criminal investigation of Mr. Hitchens. Mr. Diepraam assured me that he had been unable to ascertain the level or quantification of cocaine in Mr. Hitchens' system, and without that information he was unable to charge Mr. Hitchens with homicide.

Brewer Leasing filed a document with the Court in which Brewer Leasing contended that there was "no evidence that Mr. Hitchens was impaired," that there was "no quantification as to the amount of cocaine" in Mr. Hitchens' system, that there was "no information" as to whether the substance tested was cocaine or a cocaine metabolite, and that since there was no quantification on the amount of cocaine, no information as to whether it was cocaine or cocaine metabolite, and there was no evidence that Mr. Hitchens was impaired, the positive drug test on Mr. Hitchens for the presence of cocaine should not be admitted into evidence at the trial of the case. With great reluctance Mr. Elwood and I agreed to the proposed Order since we had no information that contradicted these claims by Brewer Leasing.

Page 2 of 7

76

**II.**   **No negligence.**

The claims by Home State that I was negligent with regard to failing to discover the cocaine level of Mr. Hitchens, and that I learned of the cocaine level of Mr. Hitchens in August of 2010, are completely false and unsupported by any facts.

I spent a significant amount of time and a great deal of effort trying to investigate and prove the cocaine level of Mr. Hitchens. My efforts, and the efforts of the other lawyers, exceeded ordinary care. In light of the efforts by Brewer Leasing and its counsel to conceal the truth I do not know how any lawyer representing any plaintiff or any defendant could have obtained the truth. I am not an expert on criminal procedure so I do not know what the limits are with regard to the subpoena power of an Assistant District Attorney or a grand jury, but it appears that the only way anyone could have overcome the efforts to conceal the cocaine level would have been for the District Attorney's office or a grand jury to subpoena the records from the testing service.

The claim that I first learned of the cocaine level in August 2010 is a false fantasy. In August 2010 for the first time Mike Hays and his firm made available to me "the file" of George Jackson with regard to the underlying case. But the reality was that the documents I was shown were limited. I did not see the February 2007 letter from Mr. Hays, the investigator's report, or the initial report of defense counsel. In addition, numerous other boxes containing numerous other documents were not revealed to me. None of Mr. Jackson's emails were provided (many are still not produced), his letter to the mediator was not provided (and still has not been provided), his notes from his first meeting with me were not provided (and still have not been provided), and various other documents were not revealed to me.

I first saw Mike Hays' letter of February 2007 and George Jackson's initial defense attorney status report either the last week of October or the first week of November 2010. I saw them from one of two sources. First, Home State finally produced documents responsive to a Request for Production many, many weeks after the responses were due. Their lawyer gave me a disc with thousands of pages of documents on it at the conclusion of a court hearing that took place on Friday, October 22, 2010. In addition, Home State sent Requests for Production which compelled the production of various documents from Mr. Hays' firm, including Mr. Jackson's file. I immediately complied with the Request for Production and tried to produce documents within a week, rather than waiting thirty days. When I went to Mr. Hays' office to coordinate the production and to meet with Mr. Nick Morrow (an attorney for Home State who decided not to attend), I learned for the first time that Mr. Hays had additional boxes of documents that he was "now producing." I watched in amazement as box after box were gradually brought to me, all of which had been concealed from me in August. I, of course, rapidly scanned through the

Page 3 of 7

boxes and had the material in the boxes copied.

The materials that revealed the cocaine level were produced in late October 2010 from Home State and from Mr. Hays. I have vivid memories of my shock, anger, and disgust when I first saw the information.

Another false claim (made with no evidentiary support) was that I designated Mr. Garrett Tucker as an expert because I knew the results of Mr. Hitchens' cocaine test. The reality is Mr. Tucker never spoke with me. He refused to speak with me or anyone in my office (other than to say he would not speak with us). I designated Mr. Tucker as an expert solely to open the possibility that if I learned what the cocaine level in Mr. Hitchens system was I would have a witness who could testify to the jury at the time of trial.

With regard to the filing of the Bill of Review, we tried to place the case in the 334th. We sent a cover sheet noting for the clerk that the case had to be in the 334th due to its nature as a Bill of Review, with the underlying judgment having been issued from the 334th. (See Exhibit 11).

Between early November 2010 and the filing of the Bill of Review lawsuit in October 2011 a variety of activity occurred. It would be accurate to characterize the activity as follows: first, shock, anger, and dismay at the concealment of the cocaine level of Mr. Hitchens. Second, an investigation, as best as we could conduct, with regard to how the matter was concealed and how the truth could be proven. This involved, in part, the deposition of Mr. Jackson. The deposition of Mr. Jackson was delayed and moved, at his request or at his counsel's request, to June of 2011. Third, without waiving the attorney client privilege or the work product exemption, it is accurate to say that after the investigation was completed the matter had to be discussed among the various individuals involved on our team and with Mr. Patterson. The decision had to be made whether to file the Bill of Review, and that decision was certainly not made lightly.

## III.  Inducement.

In January 2009 this case seemed incapable of settlements.

On January 28, 2009 I was diagnosed with cancer. I delayed treatment to get the Patterson case resolved. With the courteous assistance of opposing counsel and Judge McCally, the trial setting was adjusted from a two week docket of March 30– April 10 to a preferential setting to start April 6, 2009: this allowed me to schedule surgery with a level of comfort that I would not be in trial after April 24.

On the afternoon of Friday, April 3, 2009, I received an unexpected call from

Page 4 of 7

Amanda Hilty. She was lead counsel for Sagamore Insurance in their suit against Texas Stretch (Hitchens' employer) seeking to deny any coverage or duty to defend. For the first and only time Sagamore made a realistic, legitimate settlement offer. Thus began 24 hours of unanticipated, complex, multi-party settlement discussions. At no time during these discussions did I know that the Joint Motion to exclude Mr. Hitchens' positive drug test result (Exhibit 8) was full of lies, false misrepresentations, and concealment of the truth.

I, my wife, and my son had been friends with Marcus, Diane, Daniel, and Danae Patterson for many years when Diane was killed. Marcus trusted me and relied on my legal advice as we navigated the maze that became the legal landscape of the dispute. The wreck generated three lawsuits involving the Patterson family, with over a dozen parties and dozens of witnesses, at that time. I never would have advised Marcus to accept an assignment of claims in the future or foreclose his ability to recover uninsured punitive damages from the assets of Brewer Leasing if I had known the truth about Mr. Hitchens' cocaine level. I was deceived by Brewer Leasing in this regard.

## IV.    Gross negligence.

Without proof of a cocaine level I could not prove Mr. Hitchens operated the 79,940 pound vehicle while impaired by cocaine, and without proof of impairment I did not think gross negligence could be proven by clear and convincing evidence to all twelve jurors selected.

I had been a licensed attorney for over 26 years at the time of the trial. I had been board certified in civil trial law for 20 years and civil appellate law for 16 years. I had recovered punitive damage awards ten times for plaintiffs, and my clients had been hit for punitive damages four times, so I had significant trial and appellate experience on all sides of the punitive damages debate. One of the driving reasons for accepting the two agreements with Brewer Leasing and then dropping the claim for punitives (which was not part of any agreement) was the inability to prove cocaine impairment.

While it is impossible to perfectly predict the behavior of an opposing lawyer or a jury, I believe any human being with knowledge of the whole truth has to agree that Mr. Hitchens' driving that almost killed Sheryl Skinner and then did kill Diane Patterson was grossly negligent behavior. No one can seriously claim that driving 79,940 pounds at highway speed while impaired by 43,444 nanograms of cocaine so that on a flat highway for a mile, on a clear morning, they don't see eight stopped vehicles blocking all lanes of traffic, one or two motorcycle escort vehicles with emergency flashing lights in operation, and an 198,000 pound, 160 feet long, 50 wheeled vehicle approaching is not grossly negligent.

Page 5 of 7

## V. Exhibits.

Attached to the Motion for Partial Summary Judgment are true and correct copies of the following documents:

1.  LabOne form reflecting Charles Hitchens' specimen collected June 15, 2006 at 1:29pm (produced by defendants in collision case);

2.  TxDOT form reflecting Charles Hitchens' speimen collected June 15, 2006 at 1:24pm (produced by defendants in collision case);

3.  HPD collision report (verified by HPD in deposition of investigating officer Dane Harwell);

4.  FleeScreen results of TxDOT test (produced by defendants in collision case);

5.  Mike Hays' letter to Geroge Jackson dated February 12, 2007 (produced by Mike Hays);

6.  George Jackson's February 26, 2007 Initial Status Report to Home State (produced by Home State);

7.  Harris County Case Decline report (produced by Brewer Leasing);

8.  Joint Motion to Exclude drug test (filed by Brewer Leasing);

9.  This affidavit (the original);

10. The affidavit of Marcus Patterson (the original);

11. Civil Case Information Sheet which I signed;

12. Aerial photo of scene on June 15, 2006 (produced by HPD);

13. Photo of Brewer Leasing vehicle at scene (produced by Williams Brothers); and

14. Photo of Diane Patterson's Ford Expedition at scene (produced by TxDOT)."

Further Affiant sayeth not.

**Harry Herzog**

Page 6 of 7

80

SUBSCRIBED AND SWORN TO BEFORE ME to which witness my official hand and seal

of office on the ___28th___ day of ___February___ , 2012.

_____
NOTARY PUBLIC
IN AND FOR STATE OF TEXAS

DONNA JEANNE DICKSON
MY COMMISSION EXPIRES
October 17, 2015

Page 7 of 7

81

# Appendix
# 8

## Who employed Charles Hitchens?

In the first case Texas Stretch spent 1,000 days denying employing Charles Hitchens while Brewer Leasing implied they were the employer. The documentary evidence conclusively proved the opposite. Charles Hitchens applied for a job with Texas Stretch (PX 307), signed an employment agreement with Texas Stretch (PX 308), received Texas Stretch trucker policies (PX 309), gave his time to Texas Stretch (PX 310), was paid by Texas Stretch (PX 311), and was dispatched on June 15, 2006 by Texas Stretch (PX 324; AB p. 109) while hauling a load for Texas Stretch (PX 325). After the General Manager of both companies testified that the lawyerly position was ludicrous and that Texas Stretch employed Charles Hitchens, then and only then – the week before the first trial – Texas Stretch finally admitted it employed Charles Hitchens. (PX 335).

# Appendix 9

# L E A S E A G R E E M E N T

TRACTOR OWNER _TEXAS STRETCH INC_   S. S. NO._____

ADDRESS _2103 SKINNER_   PHONE NO. _713 691 2779_

_HOUSTON, TX 77093_

DRIVER'S NAME _N/A_   S. S. NO._____

ADDRESS _N/A_   PHONE NO._____

_BREWER LEASING INC_, located at _2103 SKINNER HOUSTON, TX 77093_
herein after referred to as Lessee and _TEXAS STRETCH INC._
_2103 SKINNER HOUSTON, TX 77093_ ,
herein after referred to as Lessor, do hereby enter into this agreement for the
lease of the following equipment under the express terms and conditions set forth
below:

MAKE _2002 PETE_   SERIAL NO. _1XP5DB9X22D528915_ LICENSE NO. _20A374_

In consideration of the provisions and covenants herein contained, it is mutually
agreed as follows:

1. The Lessor's rate of pay shall be _70_ percent for power unit and _30_
percent for tractor trailer combinations of the Revenue on freight moved all Tariff.

2. That Lessee will place signs on said equipment showing that this equipment
is leased to and operated by Lessee and that upon termination of this contract by
either party such signs will be removed by Lessor, and Lessor agrees the failure to
remove such signs will result in damages to Lessor.

3. That Lessor will equip said equipment with lights and reflectors as re-
quired by the Interstate Commerce Commission and provide all accessorial equipment
as required by rules and regulations on said equipment at all times when in use of
Lessee, and keep the equipment up to the minimum mechanical requirements as set forth
in the rules and regulations. Lessee reserves the right to inspect said equipment at
any time or place while in its use to assure compliance with such provisions.

4. That Lessor will obtain and pay for all necessary state license tags and
registrations and affix same to said equipment and pay for and supply all gasoline,
oil, tires, repairs, and supplies necessary to maintain operating efficiency.
Further, Lessor shall pay all mileage, fuel, and highway taxes and post all bonds
necessary and required by various states.

5. That it is expressly understood by the parties hereto that all drivers,
helpers and/or agents of Lessor used to fulfill this contract are employees of
Lessor and Lessor assumes responsibility for acquainting these drivers, helpers,
and/or agents with the Rules and Regulations of the I.C.C. pertaining to hours of
service and maintenance of equipment and shall assure that all drivers maintain a
daily log as required and forward to Lessee said log sheets daily.



ALL-STATE LEGAL®   PLAINTIFF'S
EXHIBIT
302

6. Lessee does not agree to furnish physical damage insurance for Loss.

7. That Lessor will furnish Lessee with a doctor's physical examination certificate on any and all drivers of said equipment in accordance with the Rules and Regulations of I.C.C.

8. That Lessee assumes and will be responsible for and agrees to furnish adequate protection to the public and the shippers for automobile bodily injury, property damage, and cargo liability.

9. That during the terms of this agreement, Lessor will furnish adequate protection as to render Lessee harmless from claims arising from damage or injury to any third party resulting from bobtailing of Lessor's equipment.

10. That during the terms of this agreement, said equipment will be made available to and controlled by Lessee at all times, and all drivers and other employees of Lessor used in connection with this contract will also be under full control, direction and supervision of Lessee, or its agent.

11. That Lessor agrees that equipment herein described is to be used exclusively by Lessee and in the event said Lessor, his driver, employee, or agent shall deviate from the terms of this contract, by the transportation of freight for another, either gratuitously, or for hire, or by deviation from other terms, then this contract is automatically suspended until the equipment is returned to service of Lessee, and that Lessee shall be harmless from such deviation.

12. That this agreement shall be in full force and effect until terminated by either party hereto, but not less than 30 days, by written notice delivered by either party signatory hereto in person if an individual, or to any officer thereofsaid party is a corporation. Said agreement also may be cancelled or terminated by depositing in the U.S. Mail a notice of such cancellation, properly addressed, posted, and that said party or officer hereof is evidenced by the return registered receipt or upon the said refusal of said addressee to accept delivery thereof, and upon termination of this agreement, Lessor agrees to return to Lessee all equipment, supplies, permits, and other property of Lessee to the nearest terminal within 5 days, or be charged thirty (30) cents per mile for retrieving of such property by Lessee.

13. That if Lessor or his agent is unable to deliver cargo hauled under this agreement to the destination upon an agreed time, Lessor will immediately notify Lessee, or the consignee of such cargo of the probable delay, and that failure to give such notifications will be construed as negligence on the part of the Lessor.

14. That Lessee shall be impowered to charge Lessor all claims for shortages, losses, or damage to cargo which are not the result of accident involving the equipment covered by this agreement.

15. That Lessee will charge the first $100.00 of any claim for public liability or property damage due to negligence of Lessor, his driver, or agent, and further the Lessee will charge Lessor for all damages to cargo caused by negligence of Lessor, his driver, or agent.

16. The Lessor will be responsible to Lessee for damage to Lessee's equipment or property damages as a result of Lessor's striking any viaduct, low overhead, or other stationary object through carelessness or neglect of Lessor, his driver, or agent.

17. That Lessor shall not be paid for any load wrecked or damaged in transit and returned to origin point.

18. The Lessee shall charge Lessor in full for any and all water damage to cargo caused by neglect of Lessor, his driver, or agent.

19. The Lessee will hold from the Lessor's earnings a total of $200.00. The said $200.00 less any claims, to be refunded to Lessor or Lessee within a period of not less than thirty days and not to exceed ninety days of the termination of the lease by either party.

20. The Lessor shall reimburse the Lessee for any fines or penalties paid by the Lessee as a result of illegal or criminal acts committed by the Lessor, his driver, or agent.

21. All insurance, payroll taxes, state employment taxes shall be paid by Lessee and charged back to Lessor. Any increase in above will be charged or any decrease will be adjusted in cost.


IN WITNESS WHEREOF, The parties hereto have executed this instrument on the _26_ day of _JULY_, 19 _2005_.

LESSOR _TEXAS STRETCH INC._ BY _Douglas Sch??e_

LESSEE _BREWER LEASING INC._ BY _C B B??_

# Appendix 12

| MARCUS BRENT PATTERSON, et al | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiffs, | § | |
| v. | § | 334th JUDICIAL DISTRICT |
| | § | |
| BREWER LEASING, INC. | § | |
| | § | |
| Defendant. | § | HARRIS COUNTY, TEXAS |

## AFFIDAVIT

STATE OF TEXAS      §
                                §

COUNTY OF HARRIS    §

BEFORE ME, the undersigned authority, on this day personally appeared Harry Herzog. After being duly sworn Mr. Herzog stated under oath as follows:

"My name is Harry Herzog. I personally wrote this affidavit and the Motion to which the affidavit is attached. I have always been the lead counsel of record for the Patterson family members in all five district court lawsuits involving this wreck (two of them are suits against them), was the lead counsel in the recent trial of this case, and personally prepared every pleading on behalf of the family. I therefore have personal knowledge of everything in this affidavit. All statements in this affidavit are true and correct. I have been a licensed attorney for almost 32 years. I have been Board Certified in Civil Trial Law for almost 24 years and Civil Appellate Law for almost 20 years.

I have reviewed our pleadings files. We filed all of the following pleadings in the first case:

Plaintiffs' Original Petition on December 1, 2006;
Plaintiffs' 1st, 2nd, 3rd, 4th, and 5th Amended Petitions.

In this case we filed:

Plaintiffs' Original Petition on October 24, 2011;
Plaintiffs' 1st, 2nd, 3rd, and 4th Amended Petitions.

In response to those eleven pleadings I recall no Special Exceptions by Brewer Leasing, I show none in my files, and I have no reason to believe any were ever filed."

1016

Further Affiant sayeth not.

_____
**Harry Herzog**

SUBSCRIBED AND SWORN TO BEFORE ME to which witness my official hand

and seal of office on the 18th day of October, 2013.

_____
NOTARY PUBLIC
IN AND FOR STATE OF TEXAS

Page 2 of 2

| | | |
|---|---|---|
| MARCUS BRENT PATTERSON, INDIVIDUALLY, AS INDEPENDENT ADMINISTRATOR OF THE ESTATE OF DIANE PATTERSON, AS NEXT FRIEND OF DANIEL PATTERSON, DANAE PATTERSON, and DANIEL PATTERSON (now 18 years of age), | § § § § § § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § | |
| v. | § § | 334th JUDICIAL DISTRICT |
| BREWER LEASING, INC. | § § | |
| Defendant. | § | HARRIS COUNTY, TEXAS |

## AFFIDAVIT

| | |
|---|---|
| STATE OF TEXAS | § § |
| COUNTY OF HARRIS | § |

BEFORE ME, the undersigned authority, on this day personally appeared Harry Herzog. After being duly sworn Mr. Herzog stated under oath as follows:

"My name is Harry Herzog. I am over 21 and personally wrote this affidavit and the Reply to which the affidavit is attached. I have always been the lead counsel of record for the Patterson family members in all five district court lawsuits involving this wreck (two of them are suits against them), was the lead counsel in the recent trial of this case, and personally prepared every pleading on behalf of the family. I therefore have personal knowledge of everything in this affidavit. All statements in this affidavit are true and correct. I have been a licensed attorney for almost 32 years. I have been Board Certified in Civil Trial Law for almost 24 years and Civil Appellate Law for almost 20 years.

After I was hired we attempted to get the police report from the Houston Police Department. It had not been released so I could not obtain a copy. In August 2006 I wrote a letter to a company I believed to be acting in conjunction with Brewer Leasing's insurer. (PX 490). I later turned out to be correct. The letter addressed Brewer Leasing's responsibility for the driver in this collision. No one ever replied to my letter.

On December 1, 2006 I filed suit for the family members who hired me against Brewer Leasing (and others), claiming Brewer was liable for the

driver's negligence in the collision. (Exhibit 1 to this Reply). I attached discovery with that suit.

In February 2007 several things occurred that are relevant to the matters in issue at this time. HPD released the collision report. Two defendants surfaced and answered. I renewed my efforts to hold each company responsible for the driver's negligence, and I tried to settle quickly with each defendant.

<u>Who employed Charles Hitchens?</u>

On March 1, 2007 I received the first discovery responses. (PX 527). Brewer Leasing produced the driver file/ personnel file for Charles Hitchens. There was no explanation then, later, or through today, as to why Brewer Leasing was producing his driver file in light of the fact that every document in it relevant to the issue showed he applied for a job from Texas Stretch ("TS"), was hired by TS, signed an employment agreement with TS, gave his time records to TS, received every paycheck from TS, and there was no paper in the file that mentioned Brewer Leasing.

Sagamore Insurance, which sold a policy to TS, sued TS claiming there was no insurance coverage for this wreck. (PX 506). They later amended and also sued the Pattersons. During the course of the case Sagamore claimed that Brewer Leasing, not TS, hired and employed Charles Hitchens.

TS repeatedly denied employing Charles Hitchens.

In later discovery we obtained transcripts of recorded statements, given by Butch Brewer (AB's brother)(PX 519) and Doug Schoppe (the GM of both TS and Brewer Leasing)(PX 509) in which it was claimed that Brewer Leasing employed Hitchens.

In light of this cacophony of misdirection and confusing positions on who employed Hitchens I made sure that every pleading we filed alleged both TS and Brewer Leasing were responsible for Hitchens' negligent actions. (Exhibits 2, 3, 4, 5, and 6 to this Reply). There has never been a pleading filed by us that does not seek to hold Brewer Leasing liable for everything Charles Hitchens did negligently on June 15, 2006.

In March of 2009 I was finally able to depose Mr. Lonny Box (the GM of both companies) and Mr. A. B. Brewer (the 100% owner and President of both companies). Mr. Box testified with firmness and clarity that TS employed Hitchens, only TS employed Hitchens, and that any lawyer that said otherwise was wrong. TS filed a document with this court a few days before trial in which they finally admitted Hitchens was their employee. (PX 335).

That admission was filed within seven days of trial so I did not amend our pleading out of concern that our preferential trial date and trial assignment could be lost (and also my delayed cancer surgery possibly re-scheduled).

<u>Cocaine.</u>

On March 1, 2007 Brewer Leasing also produced a one page lab report showing Hitchens "positive: cocaine" on the post collision drug test of June 15, 2006. (PX 501, 527). Brewer Leasing never explained how they could have his drug test result if they were not his employer. Brewer Leasing has also never explained, to this day, how they could fail to produce his other drug test results that show the exact, precise, scientifically verified level of 43,444 Ng of cocaine metabolite. Nor has Brewer Leasing ever explained, to this day, how they could fail to produce those 43,444 Ng results in light of these requests (either from us or a co-defendant, Ray Bellew and Sons):

> "2.     All documents received from LabOne, with respect to the post-accident DOT Controlled Substance Test of Charles Hitchens.
>
> 3.     All documents that reflect the level of cocaine detected in Mr. Hitchens in the June 15, 2006 Post-Accident DOT Controlled Substance Test of Charles Hitchens.
>
> 4.     All documents that reflect the amount of cocaine ingested by Charles Hitchens on or before June 15, 2006 that was detected in his system in the June 15, 2006 post-accident DOT Controlled Substance Test."

(PX 530, pp. 3 and 4).

> "22.     Please produce Charles Hitchens' employment file.
>
> 24.     Please produce the test results from any drug and/or alcohol tests given to Charles Hitchens following the accident in question.
>
> 25.     Please produce all test results for all drug and/or alcohol tests given to Charles Hitchens."

(PX 532, pp. 10 and 11).

<u>Trucking law</u>.

Beginning in 2007, and continuing through last week, I have on numerous days performed legal research on federal and state legislative and administrative trucking laws, regulations, and case law. I have become very conversant in liability theories under those laws. I have attended trucking liability seminars and read many scholarly articles on the subject. Lawyers who work with me on this case have also done significant legal research in this area and then shared their results with me. I have consulted with many lawyers outside my firm and outside our formal Patterson team in an effort to leave no stone unturned and be certain I have found everything there is to find on the subject. For about a decade before she died Diane was my friend, Marcus was my friend and for a year or two my Sunday school teacher, our children were friends and playmates, and I have tried extremely hard to leave nothing undone in my efforts to resolve this case. Thus at all times, in all ways, I have tried to make sure that Brewer Leasing was liable for the driving negligence of Charles Hitchens.

<u>Pleadings</u>.

With respect to our pleadings, I always tried in the first case to have all the wiggle room I needed as they played their "who employed Hitchens" shell game. I did not think there was any real doubt in light of his personnel file, but I wanted to take no chances. Brewer Leasing never Specially Excepted to any of our six pleadings filed between December 2006 and March 2009.

In this Bill of Review case, in my pleadings I relied in large part on the clear, convincing, uncontradicted testimony of Lonny Box and A. B. Brewer with regard to the lease, the fact that all relevant documents showed TS owned the tractor at the time of the lease to Brewer Leasing, the fact that both fuel tanks on both sides of the vehicle said "Leased to Brewer Leasing" with the company logo and TxDOT number 005800147C, the cab card (carried in the vehicle and given to HPD), and the fact that Brewer Leasing admitted the existence and applicability of the lease on June 15, 2006.

<u>Brewer Leasing's ambush of us</u>.

I began to suspect a surprise was coming in September 2012. I amended our pleadings. Among other things, I made sure that I made reference to the trailer repeatedly. When Brewer Leasing failed to participate in the preparation of, or file anything with, the Pre-Trial Order in compliance with the court ordered deadline of Oct 1, 2012, I was certain a surprise was coming. I did not know what it was or could be, but I knew danger was lurking. No one, nevertheless extremely capable lawyers like Mr. Hays and Mrs. Banks/Thompson, openly flouts a court ordered deadline for a PTO and

ignores it for months unless they think they have a surprise worth the potential judicial wrath of non-compliance. They waited for over five months to file their first portions of the PTO, and those materials contained no surprises. I remained convinced a surprise was coming, but felt we were ready for it.

When we went to the pre-trial conference on July 11, 2013, I was once again braced for a surprise. It did not come.

On Friday afternoon, Aug 2, on the last business day before trial, we received the surprise. Without supplementing any discovery, on the literal eve of trial, Brewer Leasing was going to argue there was no lease.

I looked at our pleadings. All of them, in both suits against Brewer Leasing. We had one cause of action: negligence. In this case they alleged liability for the Heil trailer from Sept 2012 to the present, and I knew the Heil trailer was a separate commercial motor vehicle under both federal and Texas law and was a separately scheduled, premiumed, insured vehicle under the insurance policy. There were never any Special Exceptions. I knew the law is clear: if there are no Special Exceptions the pleading is liberally construed in favor of the pleader and any defect is waived. I also knew that in addition to ignoring their liability as a matter of law for the Heil trailer, Brewer Leasing was making the mistake of ignoring their liability for owning the Peterbilt tractor if they succeeded in their newest shell game of "who leased the tractor?" The existence of the lease was not my sole theory. It was the theory plead in the most detail.

So on Monday, August 5, 2013, when Mike Hays told the panel in voir dire that Brewer (I am doing my best to quote him word for word here based on my memory and notes) "just owned the tractor" I thought Mike Hays was making a huge mistake. I thought he was arguing something that was no defense. I thought he might as well argue Hitchens was wearing a hat or black slacks: neither was relevant or a defense. If he succeeded in convincing the jury that everything about the lease was wrong, the fuel tanks were wrong, all the testimony and documents were wrong, and whatever else he wanted to claim, it was a road to defeat for him – not a road to victory. He wanted to focus on it. I let him distract himself.

In my opinion, we tried the claim of liability for the Heil trailer by express and/or implied consent. Contrary to Brewer Leasing's claim yesterday, we introduced everything we needed to prove without objection. Every single document and all oral testimony necessary to prevail on ownership and weight was admitted without objection. Some of the evidence was in the form of defense exhibits. All of the evidence is detailed in the various documents we have filed in the last 45 days. The title to the Heil trailer relates only to

this liability and nothing else. The weight of the trailer, both empty and loaded, relates only to this liability and nothing else. Starting yesterday afternoon, Brewer Leasing is essentially arguing they are surprised by what their own exhibits prove and the liability their own exhibits create.

In my opinion we tried the claim of liability for the Peterbilt tractor by express consent. It was Brewer Leasing, and only Brewer Leasing, that argued they owned the tractor. Brewer Leasing argued everything needed to establish their own liability. In my opinion they are now estopped to deny that ownership. If that ownership makes them liable as a matter of law – which it does – then so be it. They cannot legitimately slap their surprise on us Aug 2, run it Aug 5-9, and then complain that there are no pleadings rebutting their surprise! If at any time in the seven years earlier they had made the claim, then there would have been pleadings addressing it. There had been pleadings for years alleging their liability as the owner or lessee of the tractor: there is no chance we surprised them, and they cannot legitimately claim they are surprised by the legal effect of their ambush.

In the discovery done from Dec. 1, 2006 to the present I have never seen any document that says it is a lease from Brewer Leasing to anyone (for either the tractor or the trailer). In two trials of this matter no defendant has ever offered any document which reads it is a lease of the trailer or tractor from Brewer Leasing to anyone. No witness has ever testified that on the day of this collision there was a lease of the tractor or of the trailer saying it was from Brewer Leasing to anyone. Lonny Box testified – correctly under any reading of federal and Texas law – that any such lease has to be in writing. So by claiming ownership of the tractor, and by having undenied ownership of the trailer, with no written lease of either commercial motor vehicle to anyone, and with no other entity insuring either vehicle, the legal conclusion I reach is that Brewer Leasing is absolutely, unquestionably, 100% vicariously liable for Charles Hitchens' negligent operation of each vehicle.

One of the fundamental purposes of trucking law, expressed in Texas statutory law and case law at all levels, is to provide a solvent defendant in trucking collisions.

Discovery revealed Charles Hitchens had no automobile insurance: he drove his car to work each day uninsured. He was also a paranoid schizophrenic and an admitted crack head.

All parties, and all lawyers involved, agreed that TS had no insurance coverage with Sagamore for this collision as neither the Peterbilt tractor nor the Heil trailer were scheduled vehicles. (Non-insurance, but a type of coverage under Form F or the MCS 90, were heatedly debated).

Mr. Brewer admitted in his deposition that TS was essentially gone, out of business in March 2009. Brewer Leasing's game of pin the tail on the insolvent donkeys (Hitchens and TS) flies in the face of 78 years of federal law and a long history of Texas law. It is an old legal trick, for which I refuse to fall.

The only way the vehicles rolled down several Texas highways on June 15, 2006 in compliance with the law was under the permit and insurance of Brewer Leasing. There is no way that having operated the vehicles that way on June 15, 2006 that Brewer Leasing is now suddenly surprised that they are being held liable. Even their GM, Lonny Box, candidly admitted in 2009 that Brewer Leasing was responsible for Charles Hitchens' driving on June 15, 2006.

Attached to this reply are 10 documents. Each of them is Hyperlinked. Every one is a true and correct copy of pages from the original. Some are just excerpts of relevant pages for the court's ease and some have been marked in places to quickly move the eye to the relevant portion to aid the Court and counsel."

Further Affiant sayeth not.

_____
**Harry Herzog**

SUBSCRIBED AND SWORN TO BEFORE ME to which witness my official hand and seal of office on the 17th day of September, 2013.

PAULA JAHNKE
Notary Public, State of Texas
My Commission Expires
October 02, 2015

_____
NOTARY PUBLIC
IN AND FOR STATE OF TEXAS

# Appendix 13

## CAUSE NO. 2011-64488

| | | |
|---|---|---|
| MARCUS BRENT PATTERSON, INDIVIDUALLY, AS INDEPENDENT ADMINISTRATOR OF THE ESTATE OF DIANE PATTERSON, AS NEXT FRIEND OF DANIEL PATTERSON, DANAE PATTERSON, and DANIEL PATTERSON (now 18 years of age), | § § § § § § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § | |
| v. | § § | 334th JUDICIAL DISTRICT |
| BREWER LEASING, INC. | § § § | |
| Defendant. | § | HARRIS COUNTY, TEXAS |

### PLAINTIFFS' FOURTH AMENDED PETITION FOR BILL OF REVIEW

Plaintiffs, Marcus Patterson, in his individual capacity, as independent administrator of the estate of Diane Patterson, and as next friend of Daniel Patterson and Danae Patterson, and Daniel Patterson (now 18 years of age), complain of Defendant Brewer Leasing, Inc., in this equitable bill of review to *remedy the fraudulent representations to conceal Charles Hitchens' massive cocaine level,* and show the following:

1. This Petition is being filed under Level 2 of Rule 190.1.

2. Plaintiffs are residents of Harris County, Texas.

3. Defendant, Brewer Leasing, Inc. has been served with citation, and has answered.

4. Defendants Charles Hitchens and Texas Stretch, Inc. are both new parties. Both of these new parties have previously been released by all members of the Patterson family. Neither of these parties were previously affected by this action, by Texas law they do not need to be added to this suit, they are not indispensable parties, by adding them to this suit the Patterson family does not rescind,

Page 1 of 12

29

negate, or disavow their releases, and no service of citation is requested at this time. Part of the Patterson family's settlement with Ray Bellew & Sons involved periodic payments from 2011 through 2022, as set forth in Exhibit A to the Final Judgment in case 2006-76647, and nothing in this case is designed to affect, revoke, alter, modify, or change that settlement or those structured periodic payments in any way. These two new parties are being added solely and exclusively to eliminate an invalid argument being raised by Home State on appeal in a simultaneous legal proceeding.

5.      Venue is proper in Harris County, Texas, pursuant to Section 15.002 of the Texas Civil Practice and Remedies Code, because the incident which forms the basis of this suit occurred in Harris County, Texas, and Plaintiffs and Defendant reside in Harris County, Texas.

6.      The Court has jurisdiction over this controversy because Plaintiffs seek damages within the jurisdictional limits of this Court and this Court entered the judgment under attack.

7.      On December 1, 2006, in Cause No. 2006-76647, the Patterson family sued Brewer Leasing, Inc. On June 2, 2009 they recovered a judgment against Brewer Leasing.

8.      Plaintiffs obtained a favorable judgment, but were prevented from making a meritorious claim for punitive damages and obtaining a full recovery of actual damages by the extrinsic fraud of Defendant. Defendant fraudulently concealed knowledge of the massive level of cocaine in Charles Hitchens's system at the time the tragic auto collision occurred. Brewer Leasing referred to "an allegedly positive drug test." Brewer Leasing hid the massive level (43,444 nanograms) from all plaintiffs and from some former defendants, then falsely claimed in writing to this Court just before the trial that there was "no evidence that Hitchens was impaired." Knowing the urine test administered two hours after the wreck revealed a precise and massive level of 43,444 nanograms, Brewer Leasing falsely wrote that the positive drug test "contained no quantification as to amount

of cocaine found, if any." Brewer Leasing falsely concluded, "since there is no evidence that Hitchens was impaired...". Brewer Leasing's fraudulent misrepresentations constituted extrinsic fraud and a wrongful act.

9.     The extent of the concealment is further revealed by Exhibit E to Brewer Leasing's Motion to Exclude the positive drug test. In Exhibit E Assistant District Attorney Warren Diepram recounts how neither the Houston Police Department or the Harris County District Attorney had been able to obtain the truth a year later, on June 21, 2007. "It is unknown whether the private lab... quantified the amount. As of today, this information has not been obtained..." (See Exhibits 1, 2, 3, 4, and 5).

10.     Brewer Leasing knew that 43,444 nanograms was a huge level of cocaine. Case law researched by Brewer Leasing's counsel revealed toxicologist testimony that the following levels proved impairment: 756, 1194, 1363, over 2000, and 6206 nanograms. Nanograms of 12,500 were a "considerably high value," and 26,720 nanograms were "an immense concentration." At 43,444 nanograms Charles Hitchens was massively impaired, Brewer Leasing knew it, and Brewer Leasing chose to conceal this truth and misrepresent the truth.

11.     Plaintiffs were not at fault and were not negligent in failing to discover the truth. Plaintiffs, along with other plaintiffs and a defendant in the original proceeding, sent several discovery requests to obtain information about the level of cocaine in Charles Hitchens's system. Brewer Leasing made positive assertions to Plaintiffs and this Court that there was no evidence of the level of cocaine in Charles Hitchens's system or impairment at the time of the collision. Brewer Leasing fooled the Houston Police Department, the Harris County District Attorney, all plaintiffs, two defendants, and Judge McCally.

12.     Though the Plaintiffs obtained a judgment against Brewer Leasing, they were unable to put on evidence of Charles Hitchens's level of cocaine at the time of the collision in order to prove the utter disregard for human life and gross negligence when Mr. Hitchens transported 79,940 pounds on the highway while impaired under the influence of cocaine. (Exhibit 6).

13.     Plaintiffs have exercised due diligence. Due to Defendant's fraudulent concealment and fraudulent misrepresentations, Plaintiffs were not aware that Defendant had knowledge of Charles Hitchens's extraordinary cocaine level until concealed documents were reluctantly produced in Cause Number 2010-35479, a subsequent *Stowers* case based on the original proceeding. In the *Stowers* action, Plaintiffs gained access in late October and early November 2010 to information on the cocaine level that was previously concealed and that conclusively proved fraudulent misrepresentation. This information was not discovered until well after the deadlines for a motion for new trial and an appeal had passed in 2006-76647. Now that Plaintiffs have discovered the fraud against them and this Court, Plaintiffs are seeking this Bill of Review to correct the injustice inflicted by the conscious acts of Defendant.

14.     On Saturday, April 4, 2009, just two calendar days before trial was set to begin on April 6, Brewer Leasing attempted to make a deal with the Patterson family. Those negotiations took place, and agreements were reached, by virtue of Brewer Leasing's active ongoing concealment and fraudulent misrepresentation of the devastating results of Mr. Hitchens' urine test for cocaine.

15.     On April 4, 2009 Mr. A.B. Brewer, Texas Stretch, Inc., Brewer Leasing, Inc., and Texas Stretch's insurer, Sagamore Insurance Company, reached various agreements with the Patterson family. The agreements were:

    A.      Texas Stretch would be released;

Page 4 of 12

B.      Sagamore Insurance Company would dismiss its coverage suit against Texas Stretch and the Patterson family;

C.      Texas Stretch would pay $470,000 as follows:

    1.      $400,000 by Sagamore Insurance,

    2.      $25,000 in cash by Texas Stretch, and

    3.      $45,000 over time by Texas Stretch, personally guaranteed by Mr. Brewer;

D.      Brewer Leasing would not be released, as Brewer Leasing was paying nothing and was not settling;

E.      Having personally guaranteed $45,000 to be paid by Texas Stretch, Mr. Brewer would not be personally exposed to any further payments and therefore Brewer Leasing would receive a Covenant to Not Execute;

F.      Brewer Leasing would hire Mr. Herzog to pursue the *Stowers* claims created by Home State's three wrongful denials of settlement demands, and any other claims of Brewer Leasing against Home State (breach of duty to defend, Insurance Code, etc.); and

G.      Brewer Leasing would agree to assign those claims to the Patterson family later, in the future, upon request.

16.    On April 6, 2009, the Texas Stretch settlement and the Brewer Leasing agreement without settlement were signed. On behalf of Brewer Leasing, Mr. Michael Hays, their personal counsel, orally discussed an assignment of the *Stowers* claims after a jury verdict was returned in the *Stowers* case in the future.

17.    Misunderstandings later arose. Brewer Leasing disagreed with part of Mr. Herzog's fee agreement and, without communicating their disagreement, declined to sign. Mr. Herzog sent a statutory demand notice to Home State, on behalf of Brewer Leasing, based on the oral understanding that he was hired. Once it became clear that Brewer Leasing would not sign a fee agreement, the decision was made that suit could not be filed as originally planned on behalf of Brewer Leasing so an oral request for an assignment was made and suit was filed with the Patterson family as assignees of Brewer Leasing. Brewer Leasing later signed a written confirmation in October 2010 of an assignment of claims.

18.    The Covenant, the agreement to assign claims in the future upon request, and the written assignment in October 2010 were all fraudulently induced by the wrongful behavior of Brewer Leasing, the consideration for them has failed, and they should be nullified as void ab initio.

19.    After the filing of the Plaintiffs' Original Petition for Bill of Review, with incontrovertible and conclusive evidence of Brewer Leasing's wrongful act and Brewer Leasing's extrinsic fraud attached as exhibits, Brewer Leasing eventually stipulated and agreed to set aside the Covenant to Not Execute, the June 2, 2009 Final Judgment, and all assignment efforts as void ab initio. This Court has entered an Order setting all of those aside as void ab initio.

### Liability of Brewer Leasing

20.    On July 26, 2005 Texas Stretch, Inc. was the Lessor of a 2002 Peterbilt Class 8 motor vehicle, VIN 1XPSDB9X220528915, commonly called "a tractor" or "a power unit." (Exhibit 302). Brewer Leasing, Inc. was the Lessee. Federal law, Texas law, and paragraph 8 of the Lease make Brewer Leasing liable for any injury caused from operation of the vehicle. Paragraph 2 required Brewer Leasing, as Lessee, to place signs on the vehicle showing it as leased to Brewer Leasing, Inc.:

Page 6 of 12

34

Brewer Leasing complied. Paragraph 5 specified that all drivers would be employees of Texas Stretch, Inc.: Brewer Leasing complied.

21.    In April 2006 Texas Stretch hired Charles Hitchens as a driver. On Thursday, June 15, 2006, as an employee of Texas Stretch, driving with the permission of Texas Stretch and only Texas Stretch, under the dispatch of Texas Stretch, hauling a load for Texas Stretch, Charles Hitchens operated the 79,940 pound fully loaded leased vehicle while impaired by and under the influence of a massive amount of cocaine (43,444 nanograms or more of cocaine metabolite were in his system).

22.    On June 15, 2006 officer Stan Jolly stopped traffic on I-10 just west of Highway 6. Visibility was perfect and the road was dry. Officer Jolly was in uniform and operating his motorcycle with his hazard flashers/emergency lights on. Eight vehicles stopped, blocking all three lanes of traffic. A ninth vehicle, operated by Jimmy Bimmage, began to enter I-10. Mr. Bimmage was operating with an oversize load permit. His oversized vehicle had approximately 50 wheels, measured about 160 feet long, and weighed about 198,000 pounds. Officer Robert Norris, also in uniform with his motorcycle hazard flashers/emergency lights on, was in the back of the eight stopped vehicles.

23.    Sitting high up in the driver's seat of his Class 8 motor vehicle, impaired by massive quantities of cocaine, Mr. Hitchens failed to see a 160 foot long 50 wheeled vehicle approaching from his right, eight stopped vehicles in front of him, or Officer Norris' flashers-lights and hand signal. Driving at highway speed, without braking, in full view of numerous eyewitnesses who watched in horror, Mr. Hitchens slammed into the rear of Diane Patterson's stationary Ford Expedition and then careened down the highway.

24.    Over the course of the next few minutes Diane Patterson died, nine individuals were hurt, at least five vehicles were destroyed, and three more vehicles sustained damage.

25.    Mr. Hitchens was negligent, and grossly negligent, in his operation of the vehicle leased by Brewer Leasing that displayed the Brewer Leasing logo. That negligence was a proximate cause of the collision and the death of Diane Patterson. Brewer Leasing is liable for all actual damages plus punitive damages of at most 400% of all actual damages. These actual damages include Diane Patterson's pain and mental anguish before her death, funeral and burial expenses, and then for Marcus Patterson, Daniel Patterson and Danae Patterson all of the following in the past and in the future:

A.    Pecuniary loss,

B.    Loss of companionship and society, and

C.    Mental anguish.

Marcus Patterson is also entitled to recover the fair market value of the Expedition destroyed in the collision.

26.    Brewer Leasing is liable for Mr. Hitchens' negligent driving behavior for these reasons:

A.    The lease's existence;

B.    The specific provisions of the lease;

C.    The Brewer Leasing logo on both the driver and passenger's side fuel tanks; and

D.    Mr. Hitchens' provision of a Brewer Leasing cab card to the police who investigated the collision.

27.    Brewer Leasing is liable for Charles Hitchens' gross negligence because Brewer Leasing ratified Charles Hitchens' conduct. Brewer Leasing did or knew all of the following:

A.    Knew a woman was killed in the collision;

B.    Knew Charles Hitchens admitted fault at the scene;

Page 8 of 12

36

C. Knew Charles Hitchens was drug tested about two hours after the collision;

D. Knew Charles Hitchens admitted to a private investigator the day after the collision to recent cocaine use;

E. Knew the vehicles driven by Charles Hitchens on June 15, 2006 were not scheduled vehicles (tractor or trailer) on the Texas Stretch insurance policy with Sagamore Insurance Company;

F. Knew the vehicles driven by Charles Hitchens on June 15, 2006 were scheduled vehicles on the Brewer Leasing policy with Home State County Mutual Insurance Company; and

G. Knew Charles Hitchens was an employee of Texas Stretch and never of Brewer Leasing.

Armed with these facts and the resulting fear of no insurance coverage, or inadequate coverage, Brewer Leasing took the following actions ratifying Mr. Hitchens' conduct:

H. Falsely claimed in a recorded call with a Sagamore adjuster that Charles Hitchens was a Brewer Leasing employee;

I. Produced Charles Hitchens' employee file, thereby subtly implying Charles Hitchens was their employee;

J. Implemented a plan to fraudulently misrepresent and conceal the level of cocaine revealed by Charles Hitchens' drug test;

K. Implemented a plan to lie and distort the truth to defraud the injured parties, this Court, and the Harris County District Attorney's office, so that their ratification of

Page 9 of 12

37

Charles Hitchens's conduct would have no financial impact or a lesser financial impact on Brewer Leasing and their insurance company; and

L.     Conceal their fraud and their cover-up by destroying some of the files relating to Charles Hitchens in conjunction with others and concealing the rest of the damaging evidence.

28 .     Brewer Leasing's actual, constructive, and extrinsic fraud, and wrongful acts (including all acts listed in paragraph 27) also proximately caused damages to the Patterson family, including but not limited to expenses incurred that would not have been incurred had the fraud not occurred. In addition to obtaining relief in their Bill of Review, in accordance with Texas case law the Patterson family seeks a recovery of these actual damages.

29.     For the assistance of this Court and opposing counsel, the current version of the Patterson family's proposed Jury Charge is attached reflecting all causes of action and proposed elements of damage.

## Jury Trial

30.     Plaintiffs and Defendant request an expedited jury trial, and have paid the jury fee.

## Prayer

Plaintiffs request that the Court set aside and nullify ab initio for all legal purposes its prior judgment dated June 2, 2009 as to Brewer Leasing, Inc., nullify ab initio the April 6, 2009 Covenant, nullify ab initio the April 6, 2009 agreement to assign claims in the future, nullify ab initio the oral assignment in the summer of 2010, nullify ab initio the October 2010 executed Assignment, and enter a new judgment in favor of Plaintiffs for negligence, gross negligence, and fraud with just and

fair compensation for all actual damages, punitive damages, and recovery for prejudgment interest, post judgment interest, and court costs within the jurisdictional limits of this Court.

Respectfully submitted,

HERZOG & CARP

By: _____

**Harry Herzog**
State Bar No. 09548200
P.O. Box 218845
Houston, Texas 77218-8845
(713) 781-7500
(713) 781-4797, fax

GEARY, PORTER & DONOVAN, P.C.

By: _____

**Dorothea "Dotty" L. Vidal**
State Bar No. 20578100
One Bent Tree Tower
16475 Dallas Parkway, Suite 400
Addison, Texas 75001-6837
P.O. Box 700248
Dallas, Texas 75370-0248
(972) 349-2211, direct
(972) 931-9901, fax

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing has been sent to all parties of record listed below via certified mail, return receipt requested, on this the 8th day of March, 2013.

*(Courtesy copy without exhibits via facsimile and electronic delivery)*
**Michael S. Hays**
~~Ryan M. Grant~~ Sara Banks
Hays, McConn, Rice & Pickering
400 Two Allen Center
1200 Smith Street
Houston, Texas 77002
(713) 654-1111
(713) 650-0027, fax
*Attorneys for Brewer Leasing, Inc.*

_____
**Harry Herzog**

**Filed 13 March 08 P3:57**
**Chris Daniel - District Clerk**
**Harris County**
**FAX15426354**

## CAUSE NO. 2011-64488

| | | |
|---|---|---|
| MARCUS BRENT PATTERSON, INDIVIDUALLY, AS INDEPENDENT ADMINISTRATOR OF THE ESTATE OF DIANE PATTERSON, AS NEXT FRIEND OF DANIEL PATTERSON, DANAE PATTERSON, and DANIEL PATTERSON (now 18 years of age), | § § § § § § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § | |
| v. | § § | 334th JUDICIAL DISTRICT |
| BREWER LEASING, INC. | § § § | |
| Defendant. | § | HARRIS COUNTY, TEXAS |

## AFFIDAVIT

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

BEFORE ME, the undersigned authority, on this day personally appeared Marcus Brent Patterson. After being duly sworn Mr. Patterson stated under oath as follows:

> My name is Marcus Patterson. I am a Plaintiff in this case. I am over the age of 18, have never been convicted of a crime, and have personal knowledge of every statement made in this affidavit. Every statement in this affidavit is true and correct.

> I was stunned when I learned that Mr. Hitchens had ingested a massive amount of cocaine and the level of cocaine that he ingested was improperly concealed from us in the prior lawsuit. I was more than stunned, extremely disheartened bordering on furious, when I learned that false statements were made in writing to my lawyer, to other lawyers, and to the previous judge of this Court to conceal Mr. Hitchens' cocaine impairment.

> I have reviewed the Petition of the Bill of Review. Paragraphs 7, 8, 10, 11, 12, 13, 14, 15, 16 and 18 are, to the best of my understanding of these legal proceedings, true and correct. Paragraphs 19 – 23 are consistent with all of the information I have

41

reviewed and all of the information I saw and heard during the previous trial of this case.

Further Affiant sayeth not.

_____
Marcus Brent Patterson

SUBSCRIBED AND SWORN TO BEFORE ME to which witness my official hand and seal of office on the _____ day of March, 2013.

_____
NOTARY PUBLIC
IN AND FOR STATE OF TEXAS

PAULA JAHNKE
Notary Public, State of Texas
My Commission Expires
October 02, 2015

**FEDERAL   IG TESTING CUSTODY AND CONTROL FORM**

**36639345**

SPECIMEN ID NO.

LabOne

10101 Renner Blvd
Lenexa, KS 66219
(800) 728-4064

**1: COMPLETED BY COLLECTOR OR EMPLOYER REPRESENTATIVE**

Employer Name, Address, I.D. No.

B. MRO Name, Address, Phone and Fax No.

Donor SSN or Employee I.D. No. `4` `3` `4` `5` `7` `3` `6` `5`

Reason for Test:  ☐ Pre-employment   ☐ Random   ☐ Reasonable Suspicion/Cause   ☑ Post-Accident
☐ Return to Duty   ☐ Follow-up   ☐ Other (specify) _____

Drug Tests to be Performed:  ☑ THC, COC, PCP, OPI, AMP   ☐ THC & COC Only   ☐ Other (specify) _____

Collection Site Address: _____

Collector Phone No. `7` `1` `3` `-` `4` `7` `7` `-` `8` `7` `7` `7`

Collector Fax No. `7` `1` `3` `-` `4` `7` `1` `-` `4` `7` `7` `3`

**2: COMPLETED BY COLLECTOR**

Read specimen temperature within 4 minutes. Is temperature between 90° and 100° F? ☑ Yes ☐ No. Enter Remark

Specimen Collection
☑ Split   ☐ Single   ☐ None Provided (Enter Remark)   ☐ Observed (Enter Remark)

**3: Collector affixes bottle seal(s) to bottle(s). Collector dates seal(s). Donor initials seal(s). Donor completes STEP 5 on Copy 2 (MRO Copy)**

**4: CHAIN OF CUSTODY - INITIATED BY COLLECTOR AND COMPLETED BY LABORATORY**

REMARKS

I certify that the specimen given to me by the donor identified in the certification section on Copy 2 of this form was collected, labeled, sealed and released to the Delivery Service noted in accordance with applicable Federal requirements.

Collector's Name (PRINT First, MI, Last)

X _____
Signature of Collector

Date of Collection
Time of Collection
☐ AM ☑ PM

**SPECIMEN BOTTLE(S) RELEASED TO:**

_____
Name of Delivery Service Transferring Specimen to Lab

**RECEIVED AT LAB**

Signature of Accessioner

(PRINT) Accessioner's Name (First, MI, Last)   Date (Mo./Day/Yr)

Primary Specimen Bottle Seal Intact
☐ Yes
☐ No. Enter Remark Below

**SPECIMEN BOTTLE(S) RELEASED TO:**

**STEP 5: COMPLETED BY DONOR**

I certify that I provided my urine specimen to the collector; that I have not adulterated it in any manner; each specimen bottle used was sealed with a tamper-evident seal in my presence; and that the information provided on this form and on the label affixed to each specimen bottle is correct.

Signature of Donor

(PRINT) Donor's Name (First, MI, Last)   Date (Mo./Day/Yr)

Daytime Phone No. (   )   Evening Phone No. 713 631 1766   Date of Birth 7 1 4 9 ?
Mo. Day Yr.

Should the results of the laboratory tests for the specimen identified by this form be confirmed positive, the Medical Review Officer will contact you to ask about prescriptions and over-the-counter medications you may have taken. Therefore, you may want to make a list of those medications for your own records. THIS LIST IS NOT NECESSARY. If you chose to make a list, do so either on a separate piece of paper or on the back of your copy (Copy 5). - DO NOT PROVIDE THIS INFORMATION ON THE BACK OF ANY OTHER COPY OF THE FORM. TAKE COPY 5 WITH YOU.

**STEP 6: COMPLETED BY MEDICAL REVIEW OFFICER - PRIMARY SPECIMEN**

In accordance with applicable Federal requirements, my determination/verification is:

☐ NEGATIVE   ☐ POSITIVE   ☐ TEST CANCELED   ☐ REFUSAL TO TEST BECAUSE:
☐ DILUTE   ☐ ADULTERATED   ☐ SUBSTITUTED

**EXHIBIT 1**

REMARKS _____

Signature of Medical Review Officer   (PRINT) Medical Review Officer's Name (First, MI, Last)   Date (Mo./Day/Yr)

**STEP 7: COMPLETED BY MEDICAL REVIEW OFFICER - SPLIT SPECIMEN**

In accordance with applicable Federal requirements, my determination/verification for the split specimen (if tested) is:

☐ RECONFIRMED   ☐ FAILED TO RECONFIRM - REASON _____

Signature of Medical Review Officer   (PRINT) Medical Review Officer's Name (First, MI, Last)   Date (Mo./Day/Yr)

43

# U.S. Department of Transportation (DOT)
## Alcohol Testing Form ▶
*(The instructions for completing this form are on the back of Copy 3)*

### STEP 1: TO BE COMPLETED BY ALCOHOL TECHNICIAN

A: Employee Name ___CHARLES A. HITCHENS___
(Print) (First, M.I., Last)

B: SSN or Employee ID No. ___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___

C: Employer Name ___DOVE TEXAS STRETCH INC___

Street ___2103 SKINNER___

___HOUSTON, TX 77093___

City, ST ZIP

DER Name and
Telephone No. ___BUTCH BREWER___ ___7136912775___
DER Name                DER (Area Code & Phone Number)

D: Reason for Test: ☐Random ☐Reasonable Susp. ☑Post-Accident ☐Return to Duty ☐Follow-up ☐Pre-employment

EVIDENCE
RBT IU# 018703
DATE 06-15-06
TEST NO 0051
IU#
463458865
EE IU# 062076
SCREENING
TIME
000 AUTO 01:24
TAPE

### STEP 2: TO BE COMPLETED BY EMPLOYEE

I certify that I am about to submit to alcohol testing required by U.S. Department of Transportation regulations and that the identifying information provided on the form is true and correct.

Signature of Employee

Date ▶ 6-15-06 Month / Day / Year

### STEP 3: TO BE COMPLETED BY ALCOHOL TECHNICIAN

(If the technician conducting the screening test is not the same technician who will be conducting the confirmation test, each technician must complete their own form.) I certify that I have conducted alcohol testing on the above named individual in accordance with the procedures established in the U.S. Department of Transportation regulation, 49 CFR Part 40, that I am qualified to operate the testing device(s) identified, and that the results are as recorded.

TECHNICIAN: ☑BAT ☐STT   DEVICE: ☐SALIVA ☑BREATH* 15-Minute Wait: ☐Yes ☐No

SCREENING TEST: *(For BREATH DEVICE' write in the space below only if the testing device is not designed to print.)*

| Test # | Testing Device Name | Device Serial # OR Lot # & Exp. Date | Activation Time | Reading Time | Result |
|--------|--------------------|------------------------------------|-----------------|--------------|--------|
|        |                    |                                    |                 |              |        |

CONFIRMATION TEST: *Results MUST be affixed to each copy of this form or printed directly onto the form.*

REMARKS: _____

___TEXAS STRETCH INC___ ___2103 SKINNER___
Alcohol Technician's Company        Company Street Address

___DOUGLAS SCHOPPE___ ___HOUSTON, TX 77093___
(PRINT) Alcohol Technician's Name (First, M.I., Last)  Company City, State, Zip

___713 691 2779___
Phone Number (Area Code & Number)

Signature of Alcohol Technician

Date 6 / 15 / 06 Month / Day / Year

### STEP 4: TO BE COMPLETED BY EMPLOYEE IF TEST RESULT IS 0.02 OR HIGHER

I certify that I have submitted to the alcohol test, the results of which are accurately recorded on this form. I understand that I must not drive, perform safety-sensitive duties, or operate heavy equipment because the results are 0.02 or greater.

Signature of Employee _____ Date _____ Month / Day / Year

44

FleetScreen, Ltd.
6000 Western Place
Suite 480
Fort Worth, Texas 76107

**ATTENTION:**

Butch Brewer

Texas Stretch, Inc.                         Participant: Charles Hitchens
2103 Skinner Road                          Participant ID:    337
Houston, TX 77093                            SSN: 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

## Results of DOT Controlled Substance Test

Record Status: Positive                  Laboratory: LabOne, Inc.
Test Type: Post-accident Test                        10101 Renner Boulevard
Collection Date/Time: 06/15/2006 1:29 PM             Lenexa, KS 66219-9752
Batch ID: 20060621               Collection Site: Texas Stretch, Inc.
Specimen ID: 36639345                            2103 Skinner Road
Date COC Received: 06/20/2006                      Houston, TX 77093
Sample Type: Urine             Specimen Collector: DOUGLAS A SCHOPPE

| Substance Tested | Result | Substance Tested | Result |
|---|---|---|---|
| Amphetamines | Negative | Cocaine | POSITIVE |
| Marijuana | Negative | Opiates | Negative |
| Phencyclidine | Negative | | |

In accordance with applicable Federal requirements, my determination/verification is as above.

_____           6/21/2006
Garrett R. Tucker III, MD, MPH             Verification Date



EXHIBIT 2

EXHIBIT 7195 ✓                                                        K

# HAYS | McCONN
### Attorneys at Law

MICHAEL S. HAYS
BOARD CERTIFIED - PERSONAL INJURY TRIAL LAW
TEXAS BOARD OF LEGAL SPECIALIZATION

DIRECT LINE (713) 752-8300
MHAYS@HAYSMCCONN.COM
WWW.HAYSMCCONN.COM

February 12, 2007

George T. Jackson
Burck, Lapidus & Lanza, P.C.                          FEB 1 6 2007
5177 Richmond, Suite 850
Houston, Texas 77056

Re:     No. 2006-76647; *Marcus Brent Patterson, Individually and as Next Friend of
        Daniel Patterson and Danae Patterson v. Brewer Leasing, Inc., Texas Stretch,
        Inc. and Charles Hitchens*, Individually; In the 334th Judicial District Court of
        Harris County, Texas.

Dear George:

       As a follow-up to our conversation, I am providing to you the following:

1.     The initial investigation conducted by Charles Pollard. Mr. Pollard was retained
       by Mr. Johnson to conduct this investigation.

2.     The personnel file for Charles A. Hitchens.

3.     The title to the vehicle being driven by Mr. Hitchens showing it is owned by
       Brewer Leasing, Inc.

4.     The dispatch records for 6/15/06.

       I have talked to the drug tester. He indicated there was cocaine in the system of Mr.
Hitchens and he gave me the number of 43,444 nanograms. I am not sure what a nanogram is.
When I talked to him, he did not offer any opinion as to whether Mr. Hitchens would or would
not have been impaired. If you take what Mr. Hitchens said to Mr. Pollard, he apparently did use
cocaine 6 or 7 days before this accident. It could be that this measurement in nanograms is so
small it might not render him driving under the influence. We need to get a toxicologist to read
for us the entire drug screen so we can see whether or not an argument can be made to exclude
any type of drug activity by Mr. Hitchens because it did not cause or contribute to the cause of
the accident.



EXHIBIT 3

HAYS, McCONN, RICE & PICKERING
*A Professional Corporation*

400 Two Allen Center | 1200 Smith Street | Houston, Texas 77002
Telephone 713 654 1111 | Facsimile 713 650 0027 | haysmcconn.com

46

February 12, 2007
Page 2

_____

As a response to your letter concerning contact with Brewer Leasing, Inc., I feel this is in the best interest of Texas Stretch and Brewer Leasing. Since both companies are Mr. Brewer's companies, we need to make sure when you are requesting information for Brewer Leasing, you are only getting information from Brewer Leasing.

Sincerely,

Hays, McConn, Rice & Pickering

Michael S. Hays

MSH/bgf
Enclosure

# Charles Pollard

**P. O. Box 5163**
**Kingwood, Texas 77325**
**(281) 361- 6079 office**
**(281) 361- 6089 fax**

**Private Investigations**      State License # A5894

June 22, 2006

Mr. John Johnson
Atty at Law
55 Waugh Dr #505
Houston, Tx 77007

Re: Your client: Texas Stretch Trucking
     Plaintiff: Marcus Patterson
     My file: Q 049

Dear Mr. Johnson:

Per the instructions I received, I am reporting to you what I have found out about the June 15, 2006 accident that involved 8 vehicles on I 10 near the Hwy 6 overpass in western Harris County, Tx.

I started my investigation by meeting with Butch Brewer of Texas Stretch, at his office on June 16. I secured from Butch Brewer a photo CD of scene pictures he took at the accident scene the day of the accident, before the vehicles were moved. That CD is attached for your inspection, marked "Butch Brewer Scene Pictures". I had the pictures developed off the CD, see accompanying pictures. Note: Butch took pictures at the scene on the day of the accident and then a day later returned and shot some pictures of the entrance ramp area and a 55 mph sign about a quarter mile west of the accident scene.

At the time of my meeting with Butch Brewer, I got some of the details about the accident. He explained that the Texas Stretch driver, Charles Anthony Hitchens, had been to Mineral Resource Technologies, near La Grange, 24 miles off I 10, and picked up a load of fly ash which he was delivering to Campbell Concrete at their southwest Houston location. Please find attached the Bill of Lading, control number 10162994, attached. It shows Hitchens loaded out at 10 am and that his load, truck, and trailer weight was 79.940, which is just under the 80,000 lb load limit. Butch explained that Hitchens was on a direct route back to the Houston



**EXHIBIT 4**

48

Mr. John Johnson
June 22, 2006
Page 2

area at the time of the accident, which was somewhere around 11 am so far as we know right now. Butch made it to the scene about 1 pm, having been delayed because of the traffic and shot the pictures. He did not talk to many people except his driver, Hitchens. Doug Shoppe, dispatcher, also made the accident scene in a separate vehicle that day. Shoppe took the drug and alcohol sample from Hitchens at that time. Butch talked to HPD officer Barry Balthrop at the scene and thought Balthrop was in charge of the investigation. Balthrop and another officer asked about Hitchens, how long he worked for them, what condition the truck was in, etc. Butch explained to me that Texas Stretch does their own maintenance work and have their own mechanics, headed out by Robert Burns, a long time, very experienced mechanic. The truck is an 02 Peterbuilt, their truck #r 330 and the trailer is #55. Brewer Leasing owns all the equipment (trucks and trailers). The trailer is a cement tanker type trailer. Butch said Hitchens told him at the scene that he was traveling around 55 mph and that all the three lanes ahead of him were stopped with traffic. Hitchens hit his brakes and was trying to stop but was unable and hit a car and was trying to dodge other vehicles as he came to a stop but did hit some other vehicles.

Hitchens met me at the Texas Stretch office on June 16. Hitchens advised that he is Charles Anthony Hitchens, 7250 Colton, Houston, Tx 77016, cell phone 832 858 8378. He said he has worked for Texas Stretch about 3 months. He said he made his pickup at the Fayette Power Co. near La Grange, Tx on the day of the accident and was headed back to Houston, eastbound on I 10, traveling the speed limit, 65 to 70 mph. As he approached where the accident happened he slowed a bit down to 55 to 60 and was in the left hand lane of traffic on I 10. He said the Ford Expedition, driven by Diane Patterson, was the first car ahead of him in his lane of traffic. He was behind Patterson about 25 yards, when suddenly he saw her brake lights come on and she began to stop. Hitchens hit the brakes and tried to stop but was unable and rear ended Patterson. He talked about how her car went up in the air on impact. Hitchens then recalls sideswiping the white Cyclone Cylinder truck in the center lane of traffic and then going on past the Cyclone truck and sideswiping the long load truck which was just entering the freeway at the entrance ramp. Hitchens then went left and hit a Dodge Durango and pinned the Durango against the center guard rail where he stopped. He said the long load driver drove on a ways after impact and stopped up ahead. After stopping, Hitchens got out of his truck and could see the Expedition burning, up against the guard rail. He talked about a wrecker driver who was already on the scene, using a fire extinguisher, but the wrecker driver could not put out the fire. Hitchens said "He lost it at this time" meaning he lost control of his emotions. He said when he was near the Expedition he could not hear anyone screaming and had no idea if the occupants were out of the vehicle or not. Hitchens said prior to the accident his truck was operating properly. He

49

Mr. John Johnson
June 22, 2006
Page 3

recalled talking to a Sgt. Washington of HPD at the accident scene and how Washington put him in his patrol car for a while. Hitchens denies receiving any tickets from the accident. Hitchens recalls writing out a short statement at the scene, about how the accident happened, but does not have a copy. The DOT inspector who came to the scene got Hitchens log book.

Hitchens said he had no alcohol prior to the accident, had not had any in 40 days or so, but he does admit to doing cocaine the Friday and Saturday before the accident (5 or 6 days prior to the accident). He said he has a good driving record, his last ticket was in Gregg County, Tx for failure to control speed when he jackknifed his truck and trailer back in 02. As far as any criminal record, he said he was arrested in Georgia back in 1997 when he had a box cutter in his pocket, spent one day in jail. In Houston he had a possession of marijuana conviction 25 years ago and an unlawfully carrying weapon charge also about 25 years ago (which was not a conviction).

I have spent some time on the computer doing research about the accident. Attached is a KHOU (TV Channel 11) article on the accident, a Houston Chronicle article on the accident and the Obituary about Diane Patterson. It should be noted the KHOU also has a 6 minute uncut version of their video taken at the scene, from a helicoptor, that was on their website. Although I captured it on my computer, I can't put it on a CD. It does show the scene and the layout of the wrecked vehicles following the accident pretty well. Much of the video deals with the burning Ford Expedition. The Expedition is damaged so badly that you can't make out what kind of car it is. When I saw the car later, I could not tell what color it was from a distance because all the paint was burned off.

I have prepared a diagram which is attached, which shows the vehicles involved in the accident. It shows where they ended up. It is certainly not to scale but I believe fairly accurate. The confusing part is "How did the Expedition end up in front of Pankey's and Valdez' vehicle?" Could it be that Pankey and Valdez piled up in a separate accident, behind our accident, or were they part of our accident?

On June 20, Butch Brewer and I went over to the storage lot called KTC, located at 1700 Brittmore, Houston, Tx phone 713 468 4242, where the Texas Stretch truck is located. On arrival, we were allowed to look at our truck but told not to look at any other vehicles involved in the accident. We saw from a distance, several of the vehicles. It appears that maybe all the vehicles are there, except the long load which was drivable from the scene. We did not see the long load truck or the motorcycle (but it likely was there also). We did see from a distance the Cyclone Cylinder truck, the silver car (Pankey), the white van (Valdez), and

Mr. John Johnson
June 22, 2006
Page 4

the burned Expedition (Patterson). I shot some pictures of the Texas Stretch 02 Peterbuilt and the van and car (from a distance). My photos are attached on a CD marked Pollard pictures and the developed pictures from the CD. It should be noted that I saw blue paint on the left front of the Peterbuilt and on the right front but at a glance it did not appear the same color blue as the Durango. Butch and I believe the Expedition was also blue but can't be sure. Butch took some additional photos inside the Peterbuilt at that time.

I have also spent some time trying to contact people connected to the case, in hopes of finding out what happened. I found John Pankey's home at 23730 Hopewell Dr, Katy, Tx 77493 and left a business card with his wife. Pankey responded by phone and gave me phone 281 727 6886. Pankey says he was traveling I 10 in the left hand lane of traffic and encountered the motorcycle cop stopping traffic on eastbound I 10 for the long load that the cop was escorting. Pankey stopped in the left lane as he thought he was supposed to, and was the first car in the left lane of traffic. He said the white van driven by Valdez was stopped behind Pankey. Pankey said our truck rear ended the Expedition, the Expedition was knocked into Valdez, and Valdez was knocked into Pankey. Pankey then claims that our truck then pushed the Expedition on down the road where it began to burn. Pankey said he was alone in his Chrysler car and has some injuries.

I also talked by phone to Sgt. Stan Jolly, Harris County Constable Pct. 4 deputy, phone 281 376 3472, 6831 Cypresswood, on June 19. He was back at work that date and said he had some injuries but was back to work. He did go to a hospital from the accident scene. Jolly said he was driving his own motorcycle and he and another officer were escorting two long loads on I 10, on feeder road eastbound. He said he had his red lights and emergency siren going and that he was leading the convoy. He got up on I 10 and stopped traffic in the right two lanes of traffic. He did not intend for the far left lane to stop but they did also. He said all three eastbound lanes of traffic were stopped without any problems. The first long load truck entered the freeway at the entrance ramp and went on through with no problems. The second long load was just feeding up onto the freeway when Jolly heard the crash. Jolly was near the Cyclone Cylinder truck and saw the Cyclone truck being pushed towards Jolly. Jolly then felt an impact which he thought was a vehicle but it turned out to be the smoke stack from the Texas Stretch truck. Jolly estimates he had the traffic stopped for about 15 seconds when the accident happened. Just after Jolly was hit he looked over and saw the Expedition on fire. He said our truck after hitting Jolly, went ahead and struck the long load truck/trailer in the rear. He said all three lanes of traffic were stopped and that our truck just came along and stacked them all up, causing the whole accident.

51

Mr. John Johnson
June 22, 2006
Page 5

I checked Hitchens' criminal record on what I call the Texas Statewide search, and it was negative, see attached document. I then did a 25 year search in Harris County on Hitchens and found the possession of marijuana back on Jan 22, 1985, which was a conviction, got 3 days in jail and a fine. Also on 9-18-83 Hitchens was charged with unlawfully carrying a weapon but it was dismissed. While there at Harris County, I also checked Pankey and Diane Patterson and found nothing.

I also spent some time on the phone trying to contact the insurance carrier for Texas Stretch. The company adjuster at 888 389 0598 X 739, Kenton Kaplan, gave me claim # 000470329131 for the case, and said he had assigned it to independent adjuster Mike Alton, Crocker Claims, phone 832 593 0766 in Houston. I called Alton and gave him some details on the case since he was getting a late start.

I also made a trip down to the Houston Police Department, the Accident Division, 61 Reisner, Houston. I learned that HPD officer Dane or Dale Harwell is the main investigating officer. Another officer named Rene Paloma (a male) told me the case was still under investigation and it would take a while before the report was ready. He mentioned that the District Attorney was involved in the case. From my experience, it is going to be several weeks, possibly a month, before the report is ready.

My file is open pending further instructions. I will follow up with HPD for the report when it is ready.

Sincerely,

Charles Pollard

CAUSE NO. 2006-76647

| | | |
|---|---|---|
| MARCUS BRENT PATTERSON | § | IN THE DISTRICT COURT OF |
| INDIVIDUALLY AND AS NEXT | § | |
| FRIEND OF DANIEL PATTERSON | § | |
| AND DANAE PATTERSON | § | |
| | § | HARRIS COUNTY, T E X A S |
| v. | § | |
| | § | |
| BREWER LEASING, INC., TEXAS | § | |
| STRETCH, INC. AND CHARLES | § | |
| HITCHENS, INDIVIDUALLY | § | 334th JUDICIAL DISTRICT |

### Joint Motion of Defendants Brewer Leasing, Inc., Texas Stretch, Inc. and Charles Hitchens to Exclude Evidence: Positive Drug Test and Old Weapon Charge Not Admissible

COME NOW, Defendants BREWER LEASING, INC. ("Brewer Leasing") and TEXAS

STRETCH, INC., ("Texas Stretch") and CHARLES HITCHENS ("Hitchens"),

INDIVIDUALLY in the above-entitled and numbered cause, and file this Motion to Exclude all

evidence and testimony regarding a positive drug test and an old weapon charge of Charles

Anthony Hitchens ("Hitchens") and would shows the Court as follows:

### I.
### Background

This matter involves a multiple car collision which took place on Interstate Highway 10

in Texas. Hitchens drove an 18 wheeler that was involved in an accident. After the accident,

Hitchens cooperated with the police, was alert and was not impaired. Later, Hitchens tested

positive on a urine test for the presence of cocaine. In addition, the police accident report

includes information concerning prior weapon charges that have no bearing on any matter in

dispute here.



EXHIBIT 5

53

## II.
## Any Testimony Concerning Drug Testing
## or Alleged Drug Use Should Be Excluded

### A. Evidence of Drug Consumption is Inadmissible.

Evidence of alcohol or drug consumption is inadmissible in a case involving an automobile accident unless there is further evidence of impairment that caused the accident. *See, Trans-State Pavers, Inc. v. Haynes*, 808 S.W.2d 727 (Tex. App.--Beaumont 1991, writ denied); *Bedford v. Moore*, 166 S.W.3d 454 (Tex. App. Fort Worth 2005, no pet.); *Dorman v. Langlinais*, 592 S.W.2d 650 (Tex.Civ.App.-Beaumont 1979, no writ); *Rampel v. Wascher*, 845 S.W.2d 918 (Tex. App. San Antonio 1992 writ denied).

For example, in *Bedford v. Moore*, Edwin Bedford was involved in a motor vehicle accident with Rita Elaine Moore. Mr. Bedford died as a result of the accident. Following the accident, Moore tested positive in a drug screen for methamphetamines. *See Bedford v. Moore*, 166 S.W.3d 454 (Tex. App. Fort Worth 2005, no pet.). The Plaintiff in the *Bedford* case attempted to offer the testimony of Dr. Daniel Drew, a physician retained by the Department of Transportation who had analyzed the drug screen conducted on Moore. Upon objection, Dr. Drew was not allowed to testify about the correctness of the examination and the effects methamphetamine can have on an individual. Mr. Bedford also attempted to offer the lay testimony of witness Ronald G. Curry that Moore appeared to be under the influence of drugs at the time of the accident and that she appeared to be "hyper." The trial court excluded all evidence concerning the drug screen and its results. *Id.*

The Court of Appeals affirmed the trial court's ruling, holding:

> [E]vidence of drug usage must provide some explanation for the negligence and improper conduct. However, this was not present under our facts because Dr. Drew could not tie the presence of methamphetamines in Moore's body to *impairment* at the time of

54

the accident, and therefore could not connect the presence of the drug to causation. *Id* at 465 (emphasis added).

The Court of Appeals ultimately held that because Mr. Bedford presented no evidence that the drugs actually impaired Moore at the time of the accident: "there was no evidence that the presence of the drug was a causative factor in the accident. We hold that the trial court did not abuse its discretion by excluding the testimony of Dr. Drew or Mr. Curry." *Id* at 465.

## B. There is No Evidence that Hitchens Was Impaired.

In this case, none of the many police officers at the scene noted any impairment on the part of Hitchens during the investigation. In fact, the investigating officer, Officer Harwell stated that no officer at the scene stated that Hitchens was impaired. (*See*, deposition excerpts of Officer Harwell, attached as Exhibit "A"). Moreover, in the field note section of the police accident report, Officer Harwell noted that,

> [Hitchens] did not appear to be intoxicated or under the influence of drugs at the scene. The suspect stayed to himself at the accident scene and was on his cell phone most of the time.

(*See* excerpt from the complete HPD accident file, Exhibit #3 to the deposition of Dean Harwell, attached as Exhibit "B").

The scene supervisor, Sergeant LA Washington, confirmed that he did not observe Hitchens to be impaired, and none of the officers investigating the scene reported to Washington that Hitchens was impaired or that they suspected Hitchens was impaired. (*See*, deposition transcripts of Sergeant Washington, attached as Exhibit "C").

In addition, one of the constables involved in the escort duty who was at the scene, Officer Norris, had special training in being able to spot drug or alcohol impairment, and he did not observe any impairment on the part of Hitchens. (*See*, deposition excerpts from Officer Norris, attached as Exhibit "D").

55

Finally, the District Attorney's office declined to prosecute Hitchens for two reasons. First, the positive drug test obtained on the date of the accident, which was apparently only a screen for any detectible level, provided *no* information as to whether the substance obtained was actual cocaine or a cocaine metabolite, and contained no quantification as to amount of cocaine found, if any. Second,

> ...officers at the scene noted no signs of impairment on the defendant. This means either they missed the signs of cocaine use or that the cocaine quantity was insufficient to cause impairment.

(*See* "Case Decline Report" paragraph 4, excerpted from Exhibit #3 to the Deposition of Officer Harwell, attached as Exhibit "E").

Since there is no evidence that Hitchens was impaired, or that his alleged impairment caused or contributed to the accident, this Court must exclude any evidence or testimony regarding the positive drug test from the trial of this case.

## C. Evidence of Drug Consumption is Highly Prejudicial.

In deciding whether evidence should be excluded, the court must weigh the probative value of the evidence against its potential for unfair prejudice or confusion, and must examine the necessity and probative effect of the evidence. *See* Tex.R. Evid. 403. Evidence is unfairly prejudicial if it would tend to persuade a jury to determine an issue on an improper basis such as emotion or bias. *Olivarez v. Doe,* 164 S.W.3d 427, (Tex. App. Tyler 2004, no pet.)

When a party objects to admission of evidence as unfairly prejudicial, the trial court must conduct balancing test, weighing the danger of prejudice against the probative value of evidence. *See* Tex.R. Evid. 403; *Campbell v. State,* 118 S.W.3d 788 (Tex. App.--Houston [14th Dist.] 2003, no pet.).

56

In this case, the highly prejudicial effect of the positive test substantially outweighs the probative value of the positive test. Because no causal link between any alleged consumption of the cocaine and any impairment of Hitchens has been established, this Court must exclude all evidence of a positive test or of alleged cocaine use by Mr. Hitchens. This would include any testimony or evidence not supported by scientific evidence. Guesses or suppositions that do not establish the necessary causal link between the alleged presence of cocaine in Hitchen's system and the level of impairment necessary and required by the case law.

## III.
## Any Testimony Concerning Old
## Weapon Charge Should Be Excluded

### A. Police Accident Report Refers to a 1983 Weapon Charge.

The complete HPD accident file, Exhibit #3 to the deposition of Dean Harwell, contains a Criminal History Report on Charles Anthony Hitchens that states: "Caution → Suspect known to carry a weapon," and goes on to describe a 1983 weapon charge, as well as a prior traffic violation (*See* "Criminal History Report," excerpted from Exhibit #3 to the Deposition of Officer Harwell, attached as Exhibit "F").

There is no evidence of a conviction on either matter, and neither matter mentioned in the criminal history report has any bearing on the causation or liability in this current litigation.

### B. Evidence of Old Weapon Charge is Highly Prejudicial

As noted above, in deciding whether evidence should be excluded, the court must weigh the probative value of the evidence against its potential for unfair prejudice or confusion, and must examine the necessity and probative effect of the evidence. *See* Tex. R. Evid. 403. Evidence is unfairly prejudicial if it would tend to persuade a jury to determine an issue on an improper basis such as emotion or bias. *Olivarez v. Doe,* 164 S.W.3d 427, (Tex. App. Tyler

2004, no pet.)

When a party objects to admission of evidence as unfairly prejudicial, the trial court must conduct balancing test, weighing the danger of prejudice against the probative value of evidence. *See* Tex.R. Evid. 403; *Campbell v. State*, 118 S.W.3d 788 (Tex. App.--Houston [14th Dist.] 2003, no pet.).

In this case, the highly prejudicial of old weapon charge and a prior traffic ticket have absolutely no probative value in this present litigation and should be excluded. *See* Tex. R. Evidence 402 and 403. In addition, the alleged weapon charge occurred more than 25 years before trial and should be excluded under Tex. R. Evid. 609 because (a) Plaintiffs have not given Defendants sufficient advance written notice of intent to use such evidence, (b) there is no evidence of a conviction and (c) the alleged offense occurred more than ten years ago.

## Prayer

For the reasons stated, Brewer Leasing, Inc., Texas Stretch, Inc., and Charles Anthony Hitchens, Individually, pray this Court grant the Motion to Exclude and for all other relief, general or special, at law or in equity, to which they may show themselves justly entitled.

Respectfully submitted,

BURCK, LAPIDUS & LANZA, P.C.

By: _____
George T. Jackson
TBN: 10466950
5177 Richmond, Suite 850
Houston, Texas 77056
(713) 400-6000 phone
(713) 622-8054 fax
**Attorney for Defendant**
**Brewer Leasing, Inc.**

LAW OFFICE OF MARVIN PETERSON

58

BY: _____
Marvin B. Peterson
TBN: 15846000
Mary Ann Starks
TBN: 19071300
4611 Montrose Blvd., Suite A210
Houston, Texas 77006
Tel: 713-222-0004
Fax: 713-222-0166
**Attorneys for Defendant**
**Texas Stretch, Inc.**


BUSH & RAMIREZ, LLC

BY: _____
William S. Bush, Jr.
TBN: 03497500
24 Greenway Plaza, Suite 1700
Houston, Texas 77046
Tel: 713-626-1555
Fax: 713-622-8077
**Attorney for Defendant**
Charles Anthony Hitchens, Individually


## Certificate of Service

I hereby certify that a true and correct copy of the foregoing has been forwarded to all known counsel of record as indicated below on this the 6th day of March, 2009:

| | |
|---|---|
| Harry Herzog | Via Fax: 713-781-4797 |
| Herzog & Carp, P.C. | And Ordinary Mail |
| P.O. Box 218845 | |
| Houston, Texas 77218-8845 | |
| | |
| George Jackson | Via Fax: 713-622-8054 |
| Burck, Lapidus & Lanza, P.C. | And Ordinary Mail |
| 5177 Richmond Avenue, Suite 850 | |
| Houston, Texas 77056 | |
| | |
| William S. Bush | Via Fax: 713-622-8077 |
| Bush & Ramirez, LLC | And Ordinary Mail |
| 24 Greenway Plaza, Suite 1700 | |
| Houston, Texas 77046 | |

59

Lorin R. George                                    Via Fax: 713-781-2514
Jim Adler & Associates                             And Ordinary Mail
3D/International Tower
1900 West Loop South, 20th Floor
Houston, Texas 77027-3214

Robert L. Ramey                                    Via Fax: 713-266-1064
John Elwood                                        And Ordinary Mail
Ramey, Chandler, McKinley & Zito
One Bering Park, 750 Bering, Suite 600
Houston, Texas 77057

Charles W. Lyman                                   Via Fax; 713-652-2419
Lyman, Twining, Weinberg & Ferrell, P.C.  And Ordinary Mail
3600 One Houston Center
1221 McKinney Street
Houston, Texas 77010-2009

Michael S. Hays                                    Via Fax: 713-650-0027
Hays, McConn, Rice & Pickering                     And Ordinary Mail
1233 West Loop South, Suite 1000
Houston, Texas 77027

MARY ANN STARKS

60

## Attachments

Exhibit A        Deposition Testimony, Officer Dane Harwell

Exhibit B        Excerpt from HPD Accident File (Harwell Exhibit #3)

Exhibit C        Deposition Testimony, Officer L.A. Washington

Exhibit D        Deposition Testimony, Sgt. Robert Norris

Exhibit E        District Attorney's Office "Case Decline Report from HPD
                 Accident File (Harwell Exhibit #3)

Exhibit E        Criminal Background History from HPD Accident File
                 (Harwell Exhibit #3)

61

Page 1

CAUSE NO. 2006-76647

| | |
|---|---|
| MARCUS BRENT PATTERSON, ) | IN THE DISTRICT COURT |
| INDIVIDUALLY AND AS NEXT ) | |
| FRIEND OF DANIEL PATTERSON) | |
| AND DANAE PATTERSON ) | |
| Plaintiff ) | |
| ) | |
| vs. ) | HARRIS COUNTY, TEXAS |
| ) | |
| BREWER LEASING, INC., ) | |
| TEXAS STRETCH, INC. AND ) | |
| CHARLES HITCHINS, ) | |
| INDIVIDUALLY ) | |
| Defendants ) | 334TH JUDICIAL DISTRICT |

ORAL VIDEOTAPED DEPOSITION OF
DANE L. HARWELL
December 22, 2008

ORAL VIDEOTAPED DEPOSITION OF DANE L. HARWELL, produced as a witness at the instance of Defendant and duly sworn, was taken in the above-styled and numbered cause on December 22, 2008, from 10:22 a.m. to 1:47 p.m., before Laurie Carlisle, Certified Shorthand Reporter in and for the State of Texas, reported by computerized machine shorthand, at the offices of Hays, McConn, Rice & Pickering, 1233 West Loop South, Suite 1000, Houston, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

EXHIBIT
A

Page 21

Q.    And up a third it says supervisor on scene, Sergeant L.A. Washington.  Then it says suspect Hitchens, Charles Anthony.  Says, "The suspect did not appear to be intoxicated or under the influence of drugs at the scene.  The suspect stayed to himself at the accident scene and was on his cell phone most of the time."

Do you know who wrote that portion of this report?

A.    Looks like what I wrote.

Q.    And how can you tell that it would be something that you wrote?

A.    Because this looks like the original report.

DANE L. HARWELL       12-22-2008     PATTERSON v. BREWER LEASING, INC.

Page 141

Q. Is it fair to say that even if Mr. Hitchens tested positive, that that doesn't necessarily mean that he was impaired because of a positive test, does it?

A. No. It just means he has cocaine in his blood.

Q. And just because he tests -- or the test came back positive, it does not necessarily mean that that positive test actually caused or contributed to this incident, does it?

DANE L. HARWELL                12-22-2008    PATTERSON v. BREWER LEASING, INC.

Page 142

A.    No.

Q.    So this listing of a 68 under factor that may have caused or contributed, that has no basis, either from your observations of Mr. Hitchens' or anybody's observations of Mr. Hitchens at the scene. True?

A.    Well, it goes from the toxicology report that drugs were in his system.  That's where it's in the form.

Q.    I understand that the toxicology report came back with a positive result.

A.    Yes.

Q.    What I'm saying is there's nothing that's inherent about simply having a positive result that necessarily caused or contributed to the accident. True?

A.    Could be true, yes.

```
"""""";;;;;;";;;;;;;";;;;;;;";";;;;;;;";;;;;;;;;;;;;;;;;;";;";;";;;;";;;;";;;;;;;";;;;;;;;;"
— .cident no. 092975406 A   CURRENT INFORMATION REPORT .          PAGE 2.010
 """"";;;;;;;;";;;;;;;";;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;;
```

HALT AND I WENT AROUND.HIM TO THE LEFT AND HE STARTED PUSHING ME INTO THE WALL.
I DIDN'T SEE THE ACCIDENT I HEARD ABOUT IT LATER.

DOA AT SCENE: DECEASED PATTERSON, DIANE YARBROUGH
DRIVER VEHICLE #2
MEDICAL EXAMINER ROXANNE MENA #9011 BODY CAR 9033
ME CASE# ML06-1823
ME TOOK ANY PROPERTY OR WAS BURNED IN VEHICLE. OFFICER HARWELL TOOK TDL#200401S
IN
AID
FILE.

SUPERVISOR ON SCENE: SGT L.A. WASHINGTON 051675 1Z008D.

SUSPECT: HITCHENS, CHARLES ANTHONY TDL #06832242 DOB 07/13/63
THE SUSPECT DID NOT APPEAR TO BE INTOXICATED OR UNDER THE INFLUENCE OF DRUGS AT
THE SCENE. THE SUSPECT STAYED TO HIMSELF AT THE ACCIDENT SCENE AND WAS ON HIS
CELL PHONE MOST OF THE TIME.
TDL RECORD: 03/11/84 NO LIABILITY INSURANCE MUN 6 HOUSTON
            01/29/88 NO LIABILITY INSURANCE MUN 8 HOUSTON
            08/27/01 OVER 34,000 LBS TANDEM AXLE CMV NAVARRO CO
            10/05/01 ACCIDENT CMV YES CITATION YES INJURY
            12/23/02 ACCIDENT CMV YES CITATION YES NO INJURY
            07/16/03 ACCIDENT CMV NO  CITATION NO  NO INJURY
            05/14/05 DENY RENEWAL LTR#1-FTA
            07/11/05 DENY RENEWAL LTR#2-FTA
            09/07/05 DENIED RENEWAL - FTA
            09/08/05 DENIAL LIFTED - FTA
            11/02/05 DUTY STATUS NOT CURRENT CMV CMV HAZ NO CASS CO
OUT OF STATE:
            07/09/97 SPEEDING 01-10 MPH OVER SPEED LIMIT CMV SOUTH CAROLINA
            10/20/98 SHOW/USE IMPROP-OPERATOR'S LOG CMV WASHINGTON
            08/01/02 SPEEDING CMV CALIFORNIA
            09/02/02 SPEEDING CMV CALIFORNIA
CRIMINAL HISTORY:
            09/18/03 ARRESTED CARRY PROHIBIT WEAPON CCCL#12/TERRACINA $800 BON
            09/18/03 TRAFFIC VIOLATIONS MUN CT $81 BOND


        ********  LANGUAGE TRANSLATOR  *********
 OMP-#01 PATTERSON, DIANE YARBROUGH WF056 - NO
 ITN-#01 VALDEZ, JAVIER EDGAR WM029 - SPANISH
 ITN-#02 PANKEY, JOHN C WM037 - NO
 ITN-#03 COFIELD   JR., TIMOTHY  BM027 - NO
 ITN-#04 JOLLY, STANLEY DURAN WM043 - NO
 ITN-#05 BIMAGE, JIMMY DWAYNE BM054 - NO
 ITN-#06 ALLEN, WILLIE JOHN WM035 - NO
  N-#07 GOFFNEY, LARRY CHARLES BM031 - NO
 .FN-#08 NORRIS, ROBERT  WM000 - NO
 ITN-#09 HARTLEY, CHAD AARON WM034 - NO
 ITN-#10 LYNCH, GRAHAM RANDALL WM032 - NO
```



EXHIBIT
B
66

L.A. WASHINGTON, JR.     2-27-2009     PATTERSON v. BREWER

CAUSE NO. 2006-76647

| | |
|---|---|
| MARCUS BRENT PATTERSON ) | IN THE DISTRICT COURT OF |
| INDIVIDUALLY AND AS NEXT ) | |
| FRIEND OF DANIEL PATTERSON) | |
| AND DANAE PATTERSON ) | |
| ) | |
| VB. ) | HARRIS COUNTY, TEXAS |
| ) | |
| BREWER LEASING, INC., ) | |
| TEXAS STRETCH, INC., AND ) | |
| CHARLES HITCHENS, ) | |
| INDIVIDUALLY ) | 334TH JUDICIAL DISTRICT |

ORAL VIDEOTAPED DEPOSITION

L.A. WASHINGTON, JR.

February 27, 2009

ORAL VIDEOTAPED DEPOSITION OF L.A. WASHINGTON, JR., produced as a witness at the instance of the Defendant and duly sworn, was taken in the above-styled and numbered cause on February 27, 2009, from 11:53 a.m. to 12:59 p.m., before Terrilyn Paul, Certified Shorthand Reporter in and for the State of Texas, reported by computerized machine shorthand, at the offices of Burck, Lapidus & Lanza, P.C., 5177 Richmond, Suite 850, Houston, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.



EXHIBIT
C

CARLISLE REPORTING 713.864.4443
texasdepos@sbcglobal.net
888ecbf8-d77c-42b6-9c6e-b878db15b062
67

L.A. WASHINGTON, JR.      2-27-2009      PATTERSON v. BREWER

Page 23

Q.    You understand that there's a DOT requirement for a post-accident drug screen to take place, correct?

A.    Yes.

Q.    You also understand that simply because someone tests positive for the presence of some type of drug, whether it's cocaine or whatever it might be, the mere fact that they test positive does not necessarily mean that they're impaired, correct?

A.    That's correct.

Q.    And that's one of the reasons that trained officers will try to make a determination in the field as to whether or not somebody is impaired.

L.A. WASHINGTON, JR. 2-27-2009 PATTERSON v. BREWER

Page 24

True?

A. That's true.

Q. And in this case none of the officers that were out in the field that spoke to Mr. Hitchens ever told you while this investigation was going on that Mr. Hitchens appeared impaired to them, did they?

A. Not as I can recollect.

Q. In fact, if an officer felt as though or suspected that Mr. Hitchens was impaired at the scene of the accident, they would have had an obligation to report that to you. Is that fair to say?

A. They would have.

Q. They would have had a duty to report that to you, correct?

A. Yes.

L.A. WASHINGTON, JR. 2-27-2009 PATTERSON v. BREWER

Page 25

Q. But I guess my question is: There was nothing to indicate at the scene of the accident that you were aware of or that you were made aware of that Mr. Hitchens was under the influence of any kind of drugs to the point where he was impaired, correct?

A. That's correct.

886ecbf8-d77c-42b6-9c6e-b678db15b062
70

## DEPOSITION OF ROBERT NORRIS

0001

CAUSE NO. 2006-76647

MARCUS BRENT PATTERSON, ) THE CIVIL DISTRICT COURT
INDIVIDUALLY and AS NEXT)
FRIEND OF DANIEL       )
PATTERSON and DANAE    )
PATTERSON            )
                )
                )
VS.           ) 334TH JUDICIAL DISTRICT
                )
                )
BREWER LEASING, INC.,  )
TEXAS STRETCH, INC., and)
CHARLES HITCHENS      ) HARRIS COUNTY, TEXAS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

VIDEOTAPED AND ORAL DEPOSITION OF
SGT. ROBERT NORRIS
DECEMBER 16, 2008

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

VIDEOTAPED AND ORAL DEPOSITION OF SGT. ROBERT NORRIS, produced as a witness at the instance of the Defendant and duly sworn, was taken in the above-styled and numbered cause on the 16th of December, 2008, from 10:07 a.m. to 1:44 p.m., before RHONDA RUSSO, CSR, in and for the State of Texas, reported by Machine Shorthand, at the Law Offices of Hays, McConn, Rice & Pickering, 1233 West Loop South, Suite 1000, Houston, Texas, pursuant to the Texas Rules of Civil Procedure.

0002

APPEARANCES:

Counsel for Robert Norris and Stanley Jolly:

LAW OFFICES OF R. BURTON SPRINGER
3605 Katy Freeway
Suite 210
Houston, Texas 77007
Office: 713.227.2677  Fax: 713.802.0517
BY: R. BURTON "BURT" SPRINGER, Esq.

Page 1



EXHIBIT

D

DEPOSITION OF ROBERT NORRIS

Q. That -- I understand that. Let's back up for a second. You have a lifetime career in law enforcement, correct?

A. Yes, sir.

Q. And I think during one of the breaks I overheard you telling us you have a lengthy history in narcotics enforcement. Is that correct?

A. No, sir.

Q. Did you not have a dog or something that you were involved with?

A. No, sir.

Q. Tell us your background, then, in dealing with people who appear to be impaired.

A. Okay. I am a DWI specialist, sir, and I deal with alcohol and drug related incidents where people are driving while impaired. And as such I am a drug recognition expert which is not to recognize drugs themselves but it's to recognize drug categories where individuals who have taken some type of substance and entered into the body causing them to be impaired.

Q. Okay. You are an expert in assessing an individual and evaluating whether they are in any way impaired at the time that you were talking and interacting with them, correct?

0090

A. Most of the time, yes, sir.

Q. I know that your time period of speaking to Mr. Hitchens was brief as you testified today. Is that correct?

A. Yes, sir.

Q. But at the time you talked with him, you had taken notice of him because in your opinion he was the vehicle that had gone passed you and had struck the SUV, correct?

Page 54

72

## DEPOSITION OF ROBERT NORRIS

A. Yes, sir.

Q. In other words, in simple terms your radar was up and you were looking at him real close?

A. I was looking at him real close as being the at fault vehicle in a traffic accident, sir.

Q. At the time that you interacted with Mr. Hitchens, you had formed the opinion as a law enforcement official that he was the vehicle at fault for what was obviously a very major traffic accident, correct?

A. Yes, sir.

Q. And as such you were observing him very, very closely?

A. Not as an individual, sir.

Q. How would you -- how would you observe him other than as an individual?

0091

A. Sir, what I was doing I had entered the situation at the time. I had -- as you said it was a major accident, several entities involved. My main concern on any traffic accident, my first concern is for the injured and also to make sure I don't lose potential witnesses, suspects. And what I do, I check everybody and try to obtain some type of identification if possible. In this case I think I may have obtained an identification. I can't recall if I did or not from him. I may have and may not. I don't recall. But I know my main concern at that time was -- is to identify who I have out there to a point to find out do I have injuries, what resources I'm going to need to respond, ambulances, fire, police and so forth and I was on to the 911 system and advising them exactly what equipment I was going to need when it occurred.

Q. I understand that your first duty and responsibility out there is to make sure that no one else gets hurt. Secondly that the people who may be injured, to try and provide them with care, comfort, and assistance and those are what you're trying to do immediately after an accident, correct?

A. Yes, sir.

Q. And in the process of that, though, you had at least some interaction with Mr. Hitchens. You spoke

0092

with him, you got close to him, and may or may not have

Page 55

DEPOSITION OF ROBERT NORRIS

obtained identification from him, correct?

A. Correct.

Q. Considering the severity of the accident, if you had had even the slightest indication in any way that he was impaired, you would have brought that to the attention of the other investigating officers, wouldn't you?

A. Yes, sir.

Q. So, we can assume and know that because you did not bring that to anyone's attention because you didn't speak to anyone, you didn't identify Mr. Hitchens as being possibly impaired, that there was nothing about his demeanor in the short period of time that you talked to him that in any way indicated to you that he was impaired in any way?

A. Nothing that alarmed me at that particular time, sir.

74

lark Bearden - CaseDeclineID[1].pdf

# Case Decline Report

## FURTHER INVESTIGATION NEEDED

**Defendant First:** Charles

**Defendant Last:** Hitchens

**Date of Offense:** 6/15/2007

**Date of Reject:** 6/21/2007

**Offense:** Intoxication Manslaughter

**Officer First:** DL

**Officer Last:** Harwell

**Agency:** HOUSTON POLICE DEPARTMENT

**Witness First:** Diane

**Witness Last:** Patterson

**ADA First:** Warren

**ADA Last:** Diepraam

**OR #:** 92975406

**Reason:**

VATS REVIEWED CASE

The defendant was driving a tractor trailer eastbound in the 14800 block of the Katy Freeway just west of Highway 6. Several Precinct Four deputies had stopped freeway traffic because they were escorting an oversize load. The defendant was not able to see the stopped traffic ahead of him for some unknown reason. He drove into several cars that had stopped. The complainant's vehicle caught fire and she was killed.

The sole act of negligence so far in the case is failing to maintain a proper lookout. However, the defendant has not given a complete statement about why he was looking down, how long he was looking down, etc.

In a case of this nature, speed is critical. The HPD has been unable to determine a speed of the defendant's tractor trailer prior to impact. It is unknown if this vehicle had satellite tracking capability that wuold be of assistance. Of the fifteen witnesses that HPD spoke to (including the C4 deputies), only a couple of them mention speed. Their opinions on speed should be more extensively investigated.

The defendant, due to federal regulatory requirements, submitted to a urinalysis which tested positive for cocaine. It is unknown whether or not the private lab tested for actual cocaine, cocaine metabolites, or quantified the amount. As of today, this information has not been obtained. Therefore, it is unknown whether the amount of cocaine is a large dose three days ago, s small dose two days ago, etc. Additionally, officers at the scene noted no signs of impairment on the defendant. This means that either they missed the signs of cocaine use or that the cocaine quantity was insufficient to cause impairment. That question, however, can't be answered until the actual amounts are obtained by HPD.

Lastly, although this office is a prosecutorial office and not an investigative office, the report and photos were submitted to a private reconstructionis t for review. From the information provided to him, he was unable to answer the above questions.



EXHIBIT

E

75

HOUSTON POLICE DEPARTMENT PAGE: 001
CRIMINAL HISTORY REPORT

"",","""",",",","",",",",","","",","",","","",","","","",","","","","",","","",","",","","",","",","","",","",","","

ME: HITCHENS , CHARLES ANTHONY MID#:0000232210

"",","",","",",",",","",",","",",","",","",",",",",",",","",","",","",",","",","",","",","",","",","","",","","

UTION --------) SUSPECT KNOWN TO CARRY A WEAPON

*********************** IDENTIFYING INFORMATION ************************

CE-B SEX-M HGT-505 WGT-130 HAIR-BLK EYES-BRO COMP-MED
TE OF BIRTH - 07/13/63 PLACE OF BIRTH - TX

*********************** SCARS, MARKS, TATOOS ************************

ABDOM

*********************** IDENTIFYING NUMBERS ************************

LIC#-6832242 STATE-TX SOCIAL-SECURITY#-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

413996 SID#-03254239 FBI#-315554CA4

14/M9RO0015 LAST-PHOTO-09/18/83 NCIC-CLASS-16 61 C0 P0 16
S9U00013 PALMS-TAKEN- 10 15 13 17 13

*********************** RELATIVE INFORMATION ************************

ATIVE NAME ADDRESS PHONE

HER ANNETTE PEALS 7038 RICHWOOD 7138456245

*********************** ALIAS INFORMATION ************************

AS NAME R/S DOB DRIVER-LICENSE# SOC-SEC#

CHENS ,CHARLIE / 071363

*********************** ARREST INFORMATION ************************

TORY#: 001 ARREST DATE: 09/18/83 JAIL BOOKING#: C824142
E ADDR: 7038 RICHWOOD
CUPATION: CLERK - OFFICE
EST LOCATION:3600 UNKNOWN
STING OFFICERS: NO# 071638
DISPOSITION: RELEASED ON BOND/MADE BOND JAIL DISPOSITION DATE:09/18/83

NSE-1: CARRY PROHIBIT WEAPON INCIDENT#: 56436883
RGE.....:CARRY WEAPON(729709)IN CCCL#12/TERRACINA, $800 BOND
POSITION:

NSE-2: TRAFFIC VIOLATIONS (OTHER)
RGE......:TRAFFIC IN MUN CT, $81 BOND

EXHIBIT
F
76

CAUSE NO. 2008-76647

| | | |
|---|---|---|
| MARCUS BRENT PATTERSON INDIVIDUALLY AND AS NEXT FRIEND OF DANIEL PATTERSON AND DANAE PATTERSON | § § § § § | IN THE DISTRICT COURT OF |
| v. | § § | HARRIS COUNTY, TEXAS |
| BREWER LEASING, INC., TEXAS STRETCH, INC. AND CHARLES HITCHENS, INDIVIDUALLY | § § § § | 334th JUDICIAL DISTRICT |

**ORDER ON JOINT MOTION OF DEFENDANTS BREWER LEASING, INC. TEXAS STRETCH, INC. AND CHARLES HITCHENS TO EXCLUDE EVIDENCE**

Came on for oral hearing the Joint Motion of Defendants Brewer Leasing, Inc., Texas Stretch, Inc. and Charles Hitchens to Exclude Evidence: Positive Drug Test and Old Weapon Charge Not Admissible, and the Court, having considered the motion, responses and argument of counsel, finds that the motion has merit and should be granted. It is, therefore,

ORDERED that all evidence and testimony concerning the following matters shall be excluded from the hearing of the Jury at the trial of this cause:

(a)    Charles Anthony Hitchens' positive drug test;

(b)    Alleged use of drugs or cocaine by Charles Anthony Hitchens;

(c)    Any weapon charge against Charles Anthony Hitchens;

~~(d) Any prior traffic violation by Charles Anthony Hitchens.~~

Signed this 27th day of March, 2009.

Judge Presiding

FILED
Loren Jackson
District Clerk

MAR 27 2009

Time: _____
Harris County, Texas
By _____
Deputy

RECORDER'S MEMORANDUM
This instrument is of poor quality at the time of imaging

EXHIBIT 6

77

APPROVED AS TO FORM AND CONTENT:

**Attorney for Plaintiff:**

HERZOG & CARP, P.C.

By: _____

    Harry Herzog
    TBN: 09548200
    P.O. Box 218845
    Houston, Texas 77218-8845
    (713) 781-7800 phone
    (713) 781-4797 fax

**Attorney for Plaintiffs**

RAMEY, CHANDLER, MCKINLEY & ZITO, P.C.

By: _____

    John Elwood          Robert Ramey
    TBN: 16498200
    One Bering Park
    750 Bering, Suite 600
    Houston, Texas 77057
    (713) 266-0074 phone
    (713) 266-1064 fax

**Attorneys for Ray Bellew & Sons, Inc.**

BURCK, LAPIDUS & LANZA, P.C.

By: _____

    George T. Jackson
    TBN: 10466950
    5177 Richmond, Suite 850
    Houston, Texas 77056
    (713) 400-6000 phone
    (713) 622-6054 fax

Attorneys for Defendant, Brower Leasing, Inc.


LAW OFFICES OF MARVIN B. PETERSON

By: _____

     Marvin B. Peterson
     TBN: 15846000
     4611 Montrose, Suite A210
     Houston, Texas 77006
     (713) 222-0004 phone
     (713) 222-0166 fax
Attorney for Defendant Texas Stretch, Inc.


JIM ADLER & ASSOCIATES

By: _____

     Loris R. George   RICHARD STUCKEY
     TBN: 00798469   24041986
     8D/International Tower
     1900 West Loop South, 20th Floor
     Houston, Texas 77027-3214
     (713) 735-2108 phone
     (713) 781-2514 fax

Attorneys for Willie Allen & Lori Allen


BUSH & RAMIREZ

By: _____

     William S. Bush   By permission
     TBN: 03497500
     24 Greenway Plaza, Suite 1700
     Houston, Texas 77046
     (713) 626-1336 phone
     (713) 622-8077 fax

Attorney for Defendant Charles Hitchens

PAGE 4/5 * RCVD AT 3/13/2008 3:09:28 PM [Central Daylight Time] * SVR:HOURP-FAX06 * DNIS:8 * CSID:* * DURATION (mm-ss):01-38



I, Loren Jackson, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date
Witness my official hand and seal of office
this  April 4, 2009

Certified Document Number: 41628552 Total Pages: 3

LOREN JACKSON, DISTRICT CLERK
HARRIS COUNTY, TEXAS

In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com

# L E A S E A G R E E M E N T

TRACTOR OWNER _TEXAS STRETCH INC_     S. S. NO. _____

ADDRESS _2103 SKINNER_     PHONE NO. _7136912779_

_HOUSTON, TX 77093_

DRIVER'S NAME _N/A_     S. S. NO. _____

ADDRESS _N/A_     PHONE NO. _____

_BREWER LEASING INC_, located at _2103 SKINNER HOUSTON, TX 77093_ herein after referred to as Lessee and _TEXAS STRETCH INC._ _2103 SKINNER HOUSTON, TX 77093_, herein after referred to as Lessor, do hereby enter into this agreement for the lease of the following equipment under the express terms and conditions set forth below:

MAKE _2002 PETE_ SERIAL NO. _1XP5DB9X22D528915_ LICENSE NO. _2DA374_

In consideration of the provisions and covenants herein contained, it is mutually agreed as follows:

1.  The Lessor's rate of pay shall be _70_ percent for power unit and _30_ percent for tractor trailer combinations of the Revenue on freight moved all Tariff.

2.  That Lessee will place signs on said equipment showing that this equipment is leased to and operated by Lessee and that upon termination of this contract by either party such signs will be removed by Lessor, and Lessor agrees the failure to remove such signs will result in damages to Lessor.

3.  That Lessor will equip said equipment with lights and reflectors as re- .quired by the Interstate Commerce Commission and provide all accessorial equipment as required by rules and regulations on said equipment at all times when in use of Lessee, and keep the equipment up to the minimum mechanical requirements as set forth in the rules and regulations. Lessee reserves the right to inspect said equipment at any time or place while in its use to assure compliance with such provisions.

4.  That Lessor will obtain and pay for all necessary state license tags and registrations and affix same to said equipment and pay for and supply all gasoline, oil, tires, repairs, and supplies necessary to maintain operating efficiency. Further, Lessor shall pay all mileage, fuel, and highway taxes and post all bonds necessary and required by various states.

5.  That it is expressly understood by the parties hereto that all drivers, helpers and/or agents of Lessor used to fulfill this contract are employees of Lessor and Lessor assumes responsibility for acquainting these drivers, helpers, and/or agents with the Rules and Regulations of the I.C.C. pertaining to hours of service and maintenance of equipment and shall assure that all drivers maintain a daily log as required and forward to Lessee said log sheets daily.



PLAINTIFF'S EXHIBIT

302

ALL-STATE LEGAL®

6. Lessee does not agree to furnish physical damage insurance for Loss.

7. That Lessor will furnish Lessee with a doctor's physical examination certificate on any and all drivers of said equipment in accordance with the Rules and Regulations of I.C.C.

8. That Lessee assumes and will be responsible for and agrees to furnish adequate protection to the public and the shippers for automobile bodily injury, property damage, and cargo liability.

9. That during the terms of this agreement, Lessor will furnish adequate protection as to render Lessee harmless from claims arising from damage or injury to any third party resulting from bobtailing of Lessor's equipment.

10. That during the terms of this agreement, said equipment will be made available to and controlled by Lessee at all times, and all drivers and other employees of Lessor used in connection with this contract will also be under full control, direction and supervision of Lessee, or its agent.

11. That Lessor agrees that equipment herein described is to be used exclusively by Lessee and in the event said Lessor, his driver, employee, or agent shall deviate from the terms of this contract, by the transportation of freight for another, either gratuitously, or for hire, or by deviation from other terms, then this contract is automatically suspended until the equipment is returned to service of Lessee, and that Lessee shall be harmless from such deviation.

12. That this agreement shall be in full force and effect until terminated by either party hereto, but not less than 30 days, by written notice delivered by either party signatory hereto in person if an individual, or to any officer thereof said party is a corporation. Said agreement also may be cancelled or terminated by depositing in the U.S. Mail a notice of such cancellation, properly addressed, posted, and that said party or officer hereof is evidenced by the return registered receipt or upon the said refusal of said addressee to accept delivery thereof, and upon termination of this agreement, Lessor agrees to return to Lessee all equipment, supplies, permits, and other property of Lessee to the nearest terminal within 5 days, or be charged thirty (30) cents per mile for retrieving of such property by Lessee.

13. That if Lessor or his agent is unable to deliver cargo hauled under this agreement to the destination upon an agreed time, Lessor will immediately notify Lessee, or the consignee of such cargo of the probable delay, and that failure to give such notifications will be construed as negligence on the part of the Lessor.

14. That Lessee shall be impowered to charge Lessor all claims for shortages, losses, or damage to cargo which are not the result of accident involving the equipment covered by this agreement.

15. That Lessee will charge the first $100.00 of any claim for public liability or property damage due to negligence of Lessor, his driver, or agent, and further the Lessee will charge Lessor for all damages to cargo caused by negligence of Lessor, his driver, or agent.

16. The Lessor will be responsible to Lessee for damage to Lessee's equipment or property damages as a result of Lessor's striking any viaduct, low overhead, or other stationary object through carelessness or neglect of Lessor, his driver, or agent.

17. That Lessor shall not be paid for any load wrecked or damaged in transit and returned to origin point.

18. The Lessee shall charge Lessor in full for any and all water damage to cargo caused by neglect of Lessor, his driver, or agent.

19. The Lessee will hold from the Lessor's earnings a total of $200.00. The said $200.00 less any claims, to be refunded to Lessor or Lessee within a period of not less than thirty days and not to exceed ninety days of the termination of the lease by either party.

20. The Lessor shall reimburse the Lessee for any fines or penalties paid by the Lessee as a result of illegal or criminal acts committed by the Lessor, his driver, or agent.

21. All insurance, payroll taxes, state employment taxes shall be paid by Lessee and charged back to Lessor. Any increase in above will be charged or any decrease will be adjusted in cost.


IN WITNESS WHEREOF, The parties hereto have executed this instrument on the 26 day of JULY, 2005.

LESSOR _TEXAS STRETCH INC._ BY _____

LESSEE _BREWER LEASING INC._ BY _____

83

## CAUSE NO. 2011-64488

| | | |
|---|---|---|
| MARCUS BRENT PATTERSON, INDIVIDUALLY, AS INDEPENDENT ADMINISTRATOR OF THE ESTATE OF DIANE PATTERSON, and AS NEXT FRIEND OF DANIEL PATTERSON and DANAE PATTERSON, and DANIEL PATTERSON (now 18 years of age) | § § § § § § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § § | |
| v. | § § | 334th JUDICIAL DISTRICT |
| BREWER LEASING, INC. | § § § | |
| Defendant. | § | HARRIS COUNTY, TEXAS |

## JURY CHARGE

MEMBERS OF THE JURY:

This case is submitted to you by asking questions about the facts, which you must decide from the evidence you have heard in this trial. You are the sole judges of the credibility of the witnesses and the weight to be given their testimony, but in matters of law you must be governed by the instructions in this charge. In discharging your responsibility on this jury you will observe all the instructions which have previously been given you. I shall now give you additional instructions which you should carefully and strictly follow during your deliberations.

Do not let bias, prejudice or sympathy play any part in your deliberation.

In arriving at your answers, consider only the evidence introduced here under oath and such exhibits, if any, as have been introduced for your consideration under the rulings of the Court, that is, what you have seen and heard in this courtroom, together with the law as given you by the court. In your deliberations, you will not consider or discuss anything that is not represented by the evidence in this case.

Since every answer that is required by the charge is important, no juror should state or consider that any required answer is not important.

You must not decide who you think should win, and then try to answer the questions accordingly. Simply answer the questions, and do not discuss nor concern yourselves with the effect of your answers.

**EXHIBIT  7**

84

You will not decide the answer to a question by lot or by drawing straws, or by any other method of chance. Do not return a quotient verdict. A quotient verdict means that the jurors agree to abide by the result to be reached by adding together each juror's figures and dividing by the number of jurors to get an average. Do not do any trading on your answers; that is, one juror should not agree to answer a certain question one way if others will agree to answer another question another way.

You may render your verdict upon the vote of ten or more members of the jury to Questions 1, 2, 3 or 6. The same ten or more of you must agree upon all of the answers made and to the entire verdict. You will not, therefore, enter into an agreement to be bound by a majority or any other vote of less than ten jurors. Questions 4 and 5 may only be answered "Yes" or with a dollar amount if the jury is unanimous. If the verdict and all of the answers therein are reached by unanimous agreement, the presiding juror shall sign the verdict for the entire jury. If any juror disagrees as to any answer made by the verdict, those jurors who agree to all findings shall each sign the verdict.

These instructions are given you because your conduct is subject to review the same as that of the witnesses, parties, attorneys, and the judge. If it should be found that you have disregarded any of these instructions, it will be jury misconduct and it may require another trial by another jury; then all of our time will have been wasted.

The presiding juror or any other who observes a violation of the court's instructions shall immediately warn the one who is violating the same and caution the juror not to do so again.

85

When words are used in this charge in a sense which varies from the meaning commonly understood, you will be a given a proper legal definition which you are bound to accept in place of any other meaning.

A fact may be established by direct evidence, by circumstantial evidence, or by both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

In this case any witness or lawyer may comment on Mr. Hitchens' claim of privilege, and you may draw any inference from his refusal to testify that you believe is a reasonable inference.

Answer questions "Yes" or "No" unless otherwise instructed to answer them with percentages or dollars. A "Yes" answer must be based on a preponderance of the evidence unless otherwise instructed. If you do not find a preponderance of the evidence supports a "Yes" answer, then answer "No".

"Preponderance of the evidence" means the greater weight and degree of credible testimony or evidence introduced before you and admitted in this case. Whenever a question requires an answer other than "Yes" or "No", your answer must also be based on a preponderance of the evidence.

86

## QUESTION NO. 1

Did the negligence, if any, of any of the people or entities listed below proximately cause the occurrence in question?

"Negligence" means failure to use ordinary care: that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances.

"Ordinary care" means that degree of care that would be used by a person of ordinary prudence under the same or similar circumstances.

"Proximate cause" means that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

Please answer "Yes" or "No" for each of the following:

**Answer:**     Charles Hitchens                    _____

Williams Brothers Construction      _____

Ray Bellew and Sons                 _____

87

If you answered "Yes" to Question 1 for more than one of those named below, then answer the following question. Otherwise, do not answer the following question.

Assign percentages of responsibility only to those you found caused or contributed to cause the occurrence. The percentages you find must total 100 percent. The percentages must be expressed in whole numbers. The percentage of responsibility attributable to any one is not necessarily measured by the number of acts or omissions found. The percentage attributable to any one need not be the same percentage attributed to that one in answering another question.

## QUESTION NO. 2

For each person you found caused or contributed to cause the occurrence, find the percentage of negligence attributable to each:

| **Answer:** | Charles Hitchens | _____% |
| | Williams Brothers Construction | _____% |
| | Ray Bellew and Sons | _____% |
| | Total: | ___100___% |

88

If you answered "Yes" to Question 1, then answer Question 3. Otherwise, do not answer Question 3.

## QUESTION NO. 3

What sum of money would have fairly and reasonably compensated Diane Patterson for –

a.   Pain and mental anguish.

"Pain and mental anguish" means the conscious physical pain and emotional pain, torment, and suffering experienced by Diane Patterson before her death as a result of the occurrence in question.

Please answer in dollars and cents for damages, if any.

**Answer:**       $ _____

b.   Funeral and burial expenses.

"Funeral and burial expenses" means the reasonable amount of expenses for the funeral and burial of Diane Patterson reasonably suitable to her station in life.

Please answer in dollars and cents for damages, if any.

**Answer:**       $ _____

89

If you answered "Yes" to Question 1, then answer Question 4. Otherwise, do not answer Question 4.

## QUESTION NO. 4

What sum of money, if paid now in cash, would fairly and reasonably compensate Marcus, Daniel, and Danae Patterson for their damages, if any, resulting from the death of Diane Patterson?

Consider the elements of damages listed below and none other. Consider each element separately. Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss. Do not include interest on any amount of damages you find.

Please answer separately in dollars and cents for damages, if any.

a.     Pecuniary loss sustained in the past.

"Pecuniary loss" means the loss of care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value, that Marcus Patterson, Daniel Patterson and Danae Patterson in reasonable probability would have received from Diane Patterson had she lived.

**Answer:**    Marcus Patterson    $ _____

               Daniel Patterson    $ _____

               Danae Patterson    $ _____

b.     Pecuniary loss that, in reasonable probability, will be sustained in the future.

**Answer:**    Marcus Patterson    $ _____

               Daniel Patterson    $ _____

               Danae Patterson    $ _____

In determining damages for elements c, d, e, and f, you may consider the relationship between Marcus, Daniel, and Danae Patterson with Diane Patterson, their living arrangements, any extended absences from one another, the harmony of their family relations, and their common interests and activities.

90

c.   Loss of companionship and society sustained in the past.

"Loss of companionship and society" means the loss of the positive benefits flowing from the love, comfort, companionship, and society that Marcus Patterson, Daniel Patterson, and Danae Patterson in reasonable probability would have received from Diane Patterson had she lived.

**Answer:**   Marcus Patterson   $ _____

Daniel Patterson   $ _____

Danae Patterson   $ _____

d.   Loss of companionship and society that, in reasonable probability, will be sustained in the future.

**Answer:**   Marcus Patterson   $ _____

Daniel Patterson   $ _____

Danae Patterson   $ _____

e.   Mental anguish sustained in the past.

"Mental anguish" means the emotional pain, torment, and suffering experienced by Marcus Patterson, Daniel Patterson, and Danae Patterson because of the death of Diane Patterson.

**Answer:**   Marcus Patterson   $ _____

Daniel Patterson   $ _____

Danae Patterson   $ _____

f.   Mental anguish that, in reasonable probability, will be sustained in the future.

**Answer:**   Marcus Patterson   $ _____

Daniel Patterson   $ _____

Danae Patterson   $ _____

91

g.      <u>The fair market value of the Patterson's Ford Expedition on June 15, 2006 before physical contact occurred with the Brewer Leasing tractor-trailer.</u>

"Fair market value" means the amount that would be paid in cash by a willing buyer who desires to buy, but is not required to buy, to a willing seller who desires to sell, but is under no necessity of selling.

**Answer:**      $ _____

92

Answer Question 5 only if you unanimously answered "Yes" to Question 1. Otherwise, do not answer Question 5.

To answer "Yes" to Question 5, your answer must be unanimous. You may answer "No" to Question 5 only upon a vote of ten or more jurors. If you cannot unanimously answer "Yes" and if you cannot answer "No" upon a vote of ten or more jurors, please indicate "No Consensus".

## QUESTION NO. 5

Do you find by clear and convincing evidence that the death of Diane Patterson resulted from gross negligence attributable to Brewer Leasing, Inc.?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

"Gross negligence" means an act or omission by a driver,

(a)     which when viewed objectively from the standpoint of the driver at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

(b)     of which the driver had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others.

You are further instructed that Brewer Leasing, Inc. may be grossly negligent because of an act by Charles Hitchens if, but only if, Brewer Leasing, Inc. ratified or approved the act.

Please answer "Yes" or "No" or "No Consensus":

**Answer:** _____

93

Answer Question 6 only if you unanimously answered "Yes" to Question 5. Otherwise, do not answer Question 6.

## QUESTION NO. 6

What sum of money, if any, should be assessed against Brewer Leasing, Inc. and awarded to Diane Patterson's estate, Marcus Patterson, Daniel Patterson, and/or Danae Patterson as exemplary damages for the conduct found in response to Question 5?

"Exemplary damages" means any damages awarded as a penalty or by way of punishment but not for compensatory purposes. Exemplary damages includes punitive damages.

You are instructed that you must unanimously agree on the amount of any award of exemplary damages.

Factors to consider in awarding exemplary damages, if any, are –

     (a)     The nature of the wrong.
     (b)     The character of the conduct involved.
     (c)     The degree of culpability of the wrongdoer.
     (d)     The situation and sensibilities of the parties concerned.
     (e)     The extent to which such conduct offends a public sense of justice and propriety.
     (f)     The net worth of Brewer Leasing, Inc.

Please answer in dollars and cents, if any.

**Answer:** $ _____

94

If in your answer to Question 6 you entered any amount of exemplary damages, then answer Question 7. Otherwise, do not answer Question 7.

## QUESTION NO. 7

How do you apportion the amount of exemplary damages awarded between Diane Patterson's estate, Marcus Patterson, Daniel Patterson, and/or Danae Patterson?

Answer by stating a percentage for each person named below. The percentages you find must total 100 percent.

| **Answer:** | Diane Patterson's estate | _____% |
|---|---|---|
| | Marcus Patterson | _____% |
| | Daniel Patterson | _____% |
| | Danae Patterson | _____% |
| | Total | _____100_____% |

95

## QUESTION NO. 8

Did Brewer Leasing, Inc. commit fraud against Diane Patterson's estate, Marcus Patterson, Daniel Patterson, and/or Danae Patterson?

Fraud occurs when--

- a.  a party makes a material misrepresentation, and
- b.  the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion, and
- c.  the misrepresentation is made with the intention that it should be acted on by the other party, and
- d.  the other party relies on the misrepresentation and thereby suffers injury.

"Misrepresentation" means a false statement of fact.

Answer "Yes" or "No".

**Answer:**          _____

96

If you answered "Yes" to Question 8, then answer Question 9. Otherwise, do not answer Question 9.

## QUESTION NO. 9

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Diane Patterson's estate, Marcus Patterson, Daniel Patterson, and/or Danae Patterson for their damages, if any, that were proximately caused by such fraud?

Consider as damages only expenses incurred that would not have been incurred if no fraud took place. Do not include interest on any amount of damages you find.

Please answer in dollars and cents, if any.

**Answer:**    $ _____

After you retire to the jury room, you will select your own presiding juror. The first thing the presiding juror will do is to have this complete charge read aloud and then you will deliberate upon your answers to the questions asked.

It is the duty of the presiding juror-

to preside during your deliberations,
to see that your deliberations are conducted in an orderly manner and in accordance with the instructions in this charge,
to write out and hand to the bailiff any communications concerning the case that you desire to have delivered to the judge,
to conduct all voting on the questions,
to write your answers to the questions in the spaces provided, and
to certify your verdict in the space provided for the presiding juror's signature or to obtain the signatures of all the jurors who agree with the verdict if your verdict is less than unanimous.

You should not discuss the case with anyone, not even with other members of the jury, unless all of you are present and assembled in the jury room. Should anyone attempt to talk to you about the case before the verdict is returned, whether at the courthouse, at your home, or elsewhere, please inform the judge of this fact.

When you have answered all the questions you are required to answer under the instructions of the judge and your presiding juror has placed your answers in the spaces provided and signed the verdict as presiding juror or obtained the signatures, you will inform the bailiff at the door of the jury room that you have reached a verdict, and then you will return into court with your verdict.

98

## <u>CERTIFICATE</u>

We, the jury, have answered the above and foregoing questions 1, 2, 3, 4, 5, 6, 7, 8 and 9 as herein indicated, and herewith return same into court as our verdict.

(To be signed by the presiding juror if unanimous.)


_____

**Presiding Juror**


(To be signed by those rendering the verdict if not unanimous on either question 1, 2, 3, 4, 8 or 9)


_____      _____


_____      _____


_____      _____


_____      _____


_____

99

# Appendix 20

.

## CAUSE NO. 2006-76647

| | | |
|---|---|---|
| MARCUS BRENT PATTERSON | § | IN THE DISTRICT COURT OF |
| INDIVIDUALLY and AS NEXT | § | |
| FRIEND OF DANIEL PATTERSON | § | |
| And DANAE PATTERSON | § | |
| Plaintiffs, | § | |
| | § | |
| | § | |
| VS. | § | |
| | § | |
| BREWER LEASING, INC., | § | |
| TEXAS STRETCH, INC. and | § | |
| CHARLES HITCHENS | § | |
| Defendants. | § | |
| | § | |
| | § | HARRIS COUNTY, TEXAS |
| JAVIER VALDEZ and LARRY C. | § | |
| GOFFNEY | § | |
| Intervenors | § | 334TH JUDICIAL DISTRICT |

### Supplemental Response of Texas Stretch, Inc.
### to Plaintiffs' Motion for Partial Summary Judgment

COMES NOW Texas Stretch, Inc., Defendant in the above-entitled and numbered

cause, and files its Supplemental Response to Plaintiffs' Motion for Partial Summary

Judgment as follows:

### I.
### Introduction

This is a supplemental response on the issue of whether or not Defendant driver

Charles Hitchens, Individually, was an employee of Texas Stretch, Inc., at the time of the

June 15, 2006 multi-vehicle collision made the basis of this suit.

### II.
### The Corporate Representative has testified that Hitchens was
### the employee of Texas Stretch, Inc., but not of Brewer Leasing, Inc.

In his deposition on March 13, 2009, the transcript of which was received after

the deadline for filing written responses to Plaintiffs' Motion for Partial Summary

Judgment, General Manager Lonny Box testified by deposition as the corporate



PLAINTIFF'S EXHIBIT 335

representative of Defendant Texas Stretch, Inc. At page 36 lines 3 through 12 and at page 37 lines 19 through 22 of his deposition Mr. Box testified that Charles A. Hitchens was the employee of Texas Stretch, Inc., and that "any lawyer that says Hitchens is the employee of Brewer Leasing, Inc. is wrong." See Exhibit A, excerpts from the deposition of Lonny Box.

## Conclusion

Based upon the deposition testimony of its General Manager, Texas Stretch, Inc., withdraws its objection to a finding that Defendant Charles A. Hitchens was an employee of Texas Stretch, Inc., on June 15, 2006.

WHEREFORE, PREMISES CONSIDERED, Defendants Texas Stretch, Inc. respectfully concedes that Defendant Charles A. Hitchens was an employee of Texas Stretch, Inc., on June 15, 2006.

Respectfully submitted,

LAW OFFICE OF MARVIN PETERSON

BY: _____

MARVIN B. PETERSON
TBN: 15846000
MARY ANN STARKS
TBN: 19071300
4611 Montrose Blvd., Suite A210
Houston, Texas 77006
Tel: 713-222-0004
Fax: 713-222-0166
ATTORNEYS FOR DEFENDANT TEXAS
STRETCH, INC.

2

## Certificate of Service

I hereby certify that a true and correct copy of the foregoing has been forwarded to all known counsel of record as indicated below on this the ⅟st day of April, 2009:

Harry Herzog
Herzog & Carp, P.C.
P.O. Box 218845
Houston, Texas 77218-8845

Via Fax Only: 713-781-4797

George Jackson
Burck, Lapidus & Lanza, P.C.
5177 Richmond Avenue, Suite 850
Houston, Texas 77056

Via Fax Only: 713-622-8054

William S. Bush
Bush & Ramirez, LLC
24 Greenway Plaza, Suite 1700
Houston, Texas 77046

Via Fax Only: 713-622-8077

Richard Stucky
Jim Adler & Associates
3D/International Tower
1900 West Loop South, 20th Floor
Houston, Texas 77027-3214

Via Fax Only: 713-781-2514

Robert L. Ramey
John Elwood
Ramey, Chandler, McKinley & Zito
One Bering Park, 750 Bering, Suite 600
Houston, Texas 77057

Via Fax Only: 713-266-1064

Mike Hays
Hays, McConn, Rice & Pickering
1233 West Loop South, Suite 1000
Houston, Texas 77027

Via Fax Only: 713-650-0027

MARY ANN STARKS

3

MAR 1 9 2009

Transcript of the Testimony of
**Lonny Box**

**Date:** March 13, 2009

**Case:** Patterson, et al v. Brewer Leasing, et al

**HOUSTON REPORTING SERVICE**
**1010 LAMAR ST., SUITE 1400**
**HOUSTON, TEXAS 77002**
**713-739-1400**
**713-739-1410 (FAX)**
**713-739-1421 (FAX)**
**Email: houstondepos@earthlink.net**
**cc: houstonproduction@earthlink.net**
**Internet: www.houstoncourtreporting.com**



EXHIBIT

A

## Page 37

Mr. Hitchens is an employee of Brewer Leasing is wrong. Correct?

MR. PETERSON: Objection, form.

MS. HILTY: Objection, form.

MR. HERZOG: I'll -- I'll change the grammar.

Q. (BY MR. HERZOG) Any lawyer that says Mr. Hitchens was an employee of Brewer Leasing, comma, Inc., is just wrong. Correct?

A. I can't answer that.

Q. Why not?

A. Discussions with my attorney.

Q. Okay.

MR. HAYS: You are free to answer anything off of documents. I don't want to lead him to think that he can't get a full answer because I don't want him filing some motion with the Court. So --

A. Will you ask, again?

Q. (BY MR. HERZOG) Sure. Any lawyer that says Charles Hitchens was an employee of Brewer Leasing is just wrong?

A. Correct.

Q. He was, from the day he applied for employment and was hired, to the day of the wreck, an employee of Texas Stretch?

## Page 38

MS. HILTY: Objection, form.

A. Correct.

Q. (BY MR. HERZOG) Now you indicated earlier that you had gone back to Texas Stretch on July 26th, 2006. That was the date from your memory?

A. That's correct.

Q. But the I-9 from for Mr. Hitchens has you signing it on behalf of the company and dating it June 10th. Do you see that? (Hands document.)

MR. PETERSON: Objection, form.

A. Yes, I do.

Q. (BY MR. HERZOG) Okay. Can you explain that to me?

A. Well, I was employed at American Water Services. I was starting my own compliance review company and had discussed with Mr. Brewer about doing his compliance review. And we had entered into an agreement, and I just began that type of work for him.

Q. So you were an employee of American Water Services in June of 2006, but you had a side job as a compliance administrator or compliance officer, and you were freelancing for various companies around town?

A. Correct.

Q. Did you make good money at it?

A. I didn't -- It didn't last very long.

## Page 39

Q. How much do you get paid now as general manager?

MR. HAYS: What -- Just a minute. Why is that relevant?

MR. HERZOG: Well, I think under the 600 Series, it's an appropriate question.

MR. HAYS: The 600 series, is that a tractor or what? Just kidding. But why is it relevant? What's -- Today. Because he doesn't work -- I guess -- Do you get paid by Texas Stretch today?

THE WITNESS: Yes, I do.

Q. (BY MR. HERZOG) I'll ask that question. Do you get paid by Texas Stretch now?

A. Yes, I do.

Q. Hourly? Weekly? Monthly?

A. It's a yearly salary.

Q. Okay. And what is that salary?

A. 115,000.

Q. Why did Brewer Leasing relinquish some of its operating authority with the United States Department of Transportation?

MS. HILTY: Objection, form.

A. Ask that, again, please.

Q. (BY MR. HERZOG) Has Brewer Leasing lost some of its or relinquished some of its operating authority from the United States Department of Transportation?

## Page 40

A. Brewer Leasing didn't have authority with the United States Department of Transportation.

Q. Did it have it with TX DOT?

A. Yes.

Q. Okay. Has Brewer Leasing relinquished some of its operating authority with TX DOT?

A. Yes, it has.

Q. Why?

A. Brewer Leasing is a leasing company. It was formed as a leasing company, and it was my job to go back to the business plan when it was created. It doesn't need to be a motor carrier. It's a leasing company.

Q. Does Texas Stretch still maintain an ICC number?

A. At this time, yes.

Q. Does Texas Stretch still maintain a Texas Department of Transportation number?

A. At this time, yes.

Q. And does Texas Stretch still maintain a United States Department of Transportation number?

A. At this time, yes.

Q. But Brewer Leasing has given up its TX DOT number?

A. That's correct.

Q. Did Brewer Leasing have a logo, the State of Texas, with the name Brewer Leasing on top of it?

HOUSTON REPORTING SERVICE
713-739-1400 (FAX) 713-739-1410

Page 33

Q. Let's take a look at Exhibit 1. Do you recognize that?

A. Yes.

Q. What is that?

A. It's an Application For Employment.

Q. By who?

A. Charles Hitchens.

Q. Who did he want to apply for employment with?

A. Texas Stretch, Incorporated.

Q. Does Brewer Leasing employ any drivers?

A. No.

Q. Does Brewer Leasing ever pay a driver to drive an 18-wheeler big rig?

A. No, not to my knowledge.

Q. Would it be correct to say that Mr. Hitchens applied for employment on what date?

A. 4-10-06.

Q. Okay. April 10th of 2006, Mr. Hitchens applied for employment with Texas Stretch, Inc. Correct?

A. Correct.

Q. Texas Stretch, Inc., did a preemployment drug test on him. True?

A. Correct.

Q. Test was done on April 11, 2006?

A. I don't see that.

Page 34

Q. It cut off the 4, but try looking right over there. (Indicating.)

A. Yes.

Q. And -- and that test says that the collection site address was Texas Stretch, comma, Inc., in handwriting, and typed up in Section A, Employer Name. Correct?

A. Correct.

Q. Texas Stretch did a preemployment license check on Mr. Hitchens, a Motor Vehicle Records search. True?

A. Correct.

Q. And it says the customer is Texas Stretch?

A. Correct.

Q. Mr. Hitchens signed an Employment Agreement on April 10, 2006. Is that right?

A. That's correct.

Q. And it says at the top, the very first line, Texas Stretch, Inc. Correct?

A. Correct.

Q. And within the body of the document, twice it refers to Texas Stretch, Inc.?

A. Correct.

Q. Mr. Hitchens filled out an I-9 Department of Justice form. (Indicating.) Correct?

A. Correct.

Page 35

Q. And you were involved in that? (Indicating.)

A. That's correct.

Q. And on behalf of which company?

A. Texas Stretch, Inc.

Q. Mr. Hitchens received a Fair Credit Reporting Act Disclosure Statement on April 10, 2006. Correct?

A. Correct.

Q. From which company?

A. Texas Stretch, Inc.

Q. Every paycheck that Mr. Hitchens ever received was from Texas Stretch, Inc. Correct? (Indicating.)

A. Correct.

Q. And Texas Stretch, Inc., prepared transaction reports showing his paychecks. Correct?

A. Correct.

Q. On the day of the collision, June 15, 2006, Mr. Hitchens was driving a load of fly ash from the Fayette Power Plant to the Campbell Concrete in Cleveland, Texas. Correct? (Indicating.)

A. Correct.

Q. And according to the bill of lading, who was he driving for?

A. Texas Stretch, Inc.

Q. Have you seen Brewer Leasing's name in any of the documents that we just discussed with regard to

Page 36

Mr. Hitchens' employment?

A. No, I have not.

Q. Would you agree with me that 100 percent of the written documentation indicates that Mr. Hitchens was an employee of Texas Stretch, comma, Inc.?

A. Yes.

    MS. HILTY: Objection, form.

Q. (BY MR. HERZOG) Would you agree with me, as the general manager of the company, that Mr. Hitchens was an employee of Texas Stretch, Inc.?

    MS. HILTY: Objection, form.

A. Yes.

Q. (BY MR. HERZOG) Can you explain to me why some people, particularly lawyers in this room, have contended for years that Mr. Hitchens was not an employee of Texas Stretch, that, instead, he was an employee of Brewer Leasing?

    MR. HAYS: Again, to the extent that it calls for anything having communications with the lawyer, I just want to remind you, you can't testify to it. Otherwise, what you have looked at and what you have reviewed, you can answer.

    MR. PETERSON: And objection, form.

A. Can't answer.

Q. (BY MR. HERZOG) Any lawyer that says

9 (Pages 33 to 36)